[Nos. 28448, 28449.  Department One.  February 9, 1943.]

OZETTE RAILWAY COMPANY, *Appellant,* v. GRAYS
HARBOR COUNTY, *Respondent.*

POLSON LOGGING COMPANY, *Appellant,* v. GRAYS
HARBOR COUNTY, *Respondent.*[1]

[1]Reported in 133 P. (2d) 983.

**460**

*L. B. Donley,* for appellants.

*Paul O. Manley* and *John L. Miller,* for respondent.

STEINERT, J.—The purpose of these two actions, which were consolidated for trial and for appeal, was to recover alleged excessive taxes paid under protest by the respective plaintiffs during two successive years. Defendant in its amended answers denied the material allegations of the complaints, and by way of affirmative defense alleged that the actions had not been commenced within the time allowed by law. Upon a trial to the court without a jury, findings of fact were made from which the court concluded: (1) that the statute of limitations barred recovery of any portion of the taxes

paid by plaintiffs for the first of the two years here involved; (2) that the taxes had not been paid under protest; and (3) that the assessments as levied by the defendant county were not excessive. From judgments dismissing their complaints, plantiffs have appealed.

The two actions are identical except for the properties and the amounts involved. Appellants, Ozette Railway Company and Polson Logging Company, are corporations organized under the laws of the state of Washington. The railway company is a subsidiary of the logging company, all of its capital stock being owned and held exclusively by the latter. Each of these companies owns and operates, in its separate right, a logging railroad, used mainly for hauling logs from the logging company's timber lands to tidewater. The two railroads connect with each other, however, and all logs which are hauled over the Ozette Railway Company's road must of necessity be transported over the Polson Logging Company's road in order to reach their destination. Both railroads and the timber to which they provide access are located wholly and solely within the geographical limits of Grays Harbor county, Washington.

During the year 1937, Polson Logging Company owned 30.72 miles of main line logging railroad and 25.20 miles of spur line railroad, subject to assessment and taxation. At the same time, the Ozette Railway Company was the owner of 12.21 miles of main line logging railroad, likewise subject to assessment and taxation. During the year 1938, Polson Logging Company owned 28.08 miles of main line logging railroad, 8.20 miles of branch line railroad, 17.71 miles of spur line railroad, and 4.80 miles of abandoned railroad, all subject to assessment and taxation. In that same year, Ozette Railway Company was the owner of 12.21 miles

of main line logging railroad and 2.80 miles of spur line railroad, similarly subject to assessment and taxation.

In 1937, the two companies hauled over these logging railroads 101,986,000 board feet of logs; in 1938, they hauled 74,673,273 board feet, of which 114,127 board feet were hauled for other parties, on contract; in 1939, they hauled 104,637,967 board feet, of which 6,147,489 board feet were hauled for third persons, similarly on contract. By the end of 1939, there were still left approximately 1,200,000,000 board feet of standing timber in the area tributary to these logging railroads, about one-half of which was owned by Polson Logging Company and allied interests. Thus, if the logging operations were, and should be, continued after 1939 at the same rate of progress as before, it would require approximately twelve years to exhaust the timber tributary to these railroads.

It is conceded in these cases that neither of these logging railroads is a common carrier and that all hauling of logs for third parties was done under private contract.

For the year 1937, the assessor of Grays Harbor county assessed the logging railroad of appellant Polson Logging Company, for taxation purposes, at $125,255, and that of appellant Ozette Railway Company at $31,330. For the year 1938, the logging railroad of the Polson Logging Company was assessed at $113,870, and that of Ozette Railway Company at $34,975. These respective amounts represented computations of assessed valuations based on mileage of railroad track, as follows: Main line railroad assessed at $2,565 per mile, branch line trackage at $1,935 per mile, spur lines at $1,305 per mile, and the abandoned line at $600 per mile. There is no dispute concerning the assessed valuation placed upon the abandoned line.

It is appellants' contention, however, that main lines, branch lines, and spur lines should all have been assessed upon a valuation of $1,171 per mile, which would represent fifty per cent of their alleged true valuation of $2,342 per mile.

In making these assessments, the county assessor and his deputies used a schedule based on recommended values suggested by the state tax commission. The assessing officers thereupon fixed the values of the logging railroads in question in the following manner: They first determined the original cost of the rails, ties, angle bars, spikes, and bolts, and of the clearing, grubbing, grading, surfacing, and ballasting of the roadbeds and the laying of the rails. From the total original cost of these items, there was deducted thirty per cent thereof for depreciation, and the reduced figure was taken to represent the true, or one hundred per cent, value at that time. The assessor then fixed the assessed valuation on a ratio of forty-five per cent of the true value as previously determined. This same method of assessment was uniformly followed in assessing all logging railroads in Grays Harbor county for the periods here involved.

Appellants pleaded in their complaints that the assessor's valuations of the railroads were arbitrary, capricious, and without regard to the true values thereof, and that in making such assessments the assessor had taken into consideration, as elements of value, items that were incurred in the expense of building the railroads but which did not enter into their true values. Upon the trial, appellants contended, and in their brief they now contend, that the only value of a logging railroad, for purposes of taxation, is the second-hand value of the removable equipment, namely, the rails, ties, angle bars, spikes, bolts, frogs, and switches, but that the costs of clearing, grubbing, grading, sur-

facing, and ballasting the roadbeds and laying the rails are to be considered merely as items of expense incident to logging operations, rather than as elements of substantial value.

In support of their contention that the only money value of a logging railroad is to be found in those items of removable equipment mentioned above, appellants produced several experienced loggers who testified that in a number of sales of logging railroads in that community the prices paid therefor were comparable to the scrap or salvage value of such equipment. However, the sales concerning which those witnesses testified involved transactions where the railroad ownerships were liquidated because logging operations had ceased; or where the use of the railroad as part of the logging operations had been discontinued; or where only a small amount of available timber was left, after which the purchaser of the railroad tore out the removable equipment and disposed of it elsewhere.

Appellants also called as witnesses two assessors from other counties in this state, who testified that in assessing logging railroads in their counties they did not take into consideration the cost of clearing, grubbing, grading, surfacing, and ballasting the rights of way, and laying the rails.

On the other hand, the respondent county introduced evidence as to the value of the logging railroads upon the theory of cost of construction and equipment used thereon, less depreciation, at the same time taking into consideration the facts that these railroads were in regular operation and that large timber holdings were tributary to them and would require their services for many years.

Upon the evidence as above outlined, the court found in favor of the respondent and dismissed the actions.

■ The first question to be decided on the appeal is whether any portion of appellants' claims for recovery is barred by the statute of limitations. Laws of 1931, chapter 62, § 6, p. 204 (Rem. Rev. Stat., § 11315-6) reads, in part, as follows:

" . . . No action instituted pursuant to this act [relating to the recovery of illegal taxes] or otherwise to recover any tax levied or assessed subsequent to the passage of this act shall be commenced after the 30th day of the next succeeding January following the date when said tax is payable."

That section was amended by Laws of 1939, chapter 206, § 48, p. 772 (Rem. Rev. Stat. (Sup.), § 11315-6 [P. C. § 6882-194]), which requires that such actions be brought not later than the thirtieth day of the next succeeding *June* following the year in which the tax became payable.

Taxes levied for the year 1937 became payable in 1938. Under the terms of the 1931 statute, any action for the recovery of taxes payable in 1938 would have to be instituted not later than *January* 30, 1939. If the 1939 amendment were for any reason applicable, the action for the recovery of taxes levied in 1937 and payable in 1938 would still have to be brought not later than June 30, 1939. The present actions were commenced November 27, 1939. Any recovery in these actions for 1937 taxes, payable in 1938, is therefore barred by the statute of limitations. As to the taxes levied in 1938, payable in 1939, the time for action thereon would not expire until the specified month in 1940, and hence as to them the present actions were timely.

The second question to be decided relates to the sufficiency of the successive protests made by appellants at the times of paying the alleged excessive taxes. It is clear from the record that, with one possible exception, the protests did not comply with the provi-

sions of Rem. Rev. Stat. (Sup.), § 11315-2 [P. C. § 6882-190] requiring written protests "setting forth all of the grounds upon which such tax is claimed to be unlawful or excessive." However, one of the written protests, made by appellants on November 21, 1939, is more direct and specific than the others, and for the purposes of the instant cases only we will assume that this one protest was sufficient.

We are the more disposed to proceed upon that assumption because in so doing we are brought immediately to the consideration and determination of the third, and principal, question presented in these cases, namely, whether the appellants have shown, as they are required to do, that the taxes in these instances were excessive in the sense and to the extent of being illegal. Appellants' specific contention upon this last question is that, in levying the assessments here involved, the taxing officers proceeded upon a fundamentally wrong basis; that they placed an arbitrary and unreasonable valuation upon appellants' logging railroads; and that such procedure resulted in over-valuations which are palpably exorbitant and far in excess of the true valuations of the properties, thus constituting constructive fraud and calling for reduced valuations.

In dealing with this contention, we preface our discussion with a brief reference to certain principles and rules which are well established in this state. We have frequently said that the assessor, when making or equalizing assessments, acts in a *quasi*-judicial capacity; that the law presumes that he has performed his duty in a proper manner; that this presumption of due performance will be liberally indulged; and that the evidence to overthrow this presumption must be clear and convincing. *Templeton v. Pierce County,* 25 Wash. 377, 65 Pac. 553; *Northern Pac. R. Co. v.*

*Pierce County,* 55 Wash. 108, 104 Pac. 178; *Vancouver Water Works Co. v. Clarke County,* 55 Wash. 112, 104 Pac. 180; *Heuston v. King County,* 90 Wash. 200, 155 Pac. 773, affirmed, 92 Wash. 701, 159 Pac. 696; *Northwestern Imp. Co. v. Pierce County,* 97 Wash. 528, 167 Pac. 33, affirmed, 100 Wash. 697, 171 Pac. 60; *Weyerhaeuser Timber Co. v. Pierce County,* 97 Wash. 534, 167 Pac. 35; *Washington Union Coal Co. v. Thurston County,* 105 Wash. 208, 177 Pac. 774, 2 A. L. R. 1546; *Crosby v. Kitsap County,* 154 Wash. 212, 281 Pac. 494; *North Shore Land Co. v. Grays Harbor County,* 168 Wash. 16, 10 P. (2d) 235; *Baker Inv. Co. v. Pierce County,* 175 Wash. 669, 27 P. (2d) 1092; *American Smelting & Refining Co. v. Whatcom County,* 13 Wn. (2d) 295, 124 P. (2d) 963.

We have also declared, in a number of the cases above cited, that the complaining taxpayer has the burden of establishing by clear and convincing evidence that the assessor has not properly performed his duty.

█ The mere fact that the assessing officers have proceeded on a fundamentally wrong basis or that the assessment is excessive is not of itself alone sufficient to justify the intervention of the courts at the instance of the taxpayer. Before a court of equity will grant relief against the acts of such officers, it must clearly appear that the assessment is so palpably exorbitant and excessive as to amount to constructive fraud or to violate some constitutional principle. *Baker Inv. Co. v. Pierce County, supra; Grays Harbor Pac. R. Co. v. Grays Harbor County,* 188 Wash. 484, 62 P. (2d) 1347; *Dexter Horton Building Co. v. King County,* 10 Wn. (2d) 186, 116 P. (2d) 507. In the *Dexter Horton Building Co.* case, wherein many authorities were reviewed, it was said:

"We have been consistent in holding that the mere

overvaluation of property by the taxing officials, if they act in good faith and in the honest exercise of their judgment, furnishes no ground for relief, it being presumed that the taxing officials have done their full duty in fixing the valuation of the property; that, while equity will interfere when the taxing officials fraudulently, capriciously, or tyrannically refuse to exercise their judgment by adopting a system of valuation designed to operate unequally, and to violate a fundamental principle of the constitution, equity will not interfere to correct mere mistakes or inadvertences, or to set aside the judgments of taxing officials in relation to values."

With these principles in mind, we shall consider appellants' contention.

The statute pertinent to the question now under consideration, and the one upon which appellants mainly rely, is Rem. Rev. Stat., § 11135 (reenacted in Rem. Rev. Stat. (Sup.), § 11135 [P. C. § 6882-52]), reading as follows:

"All property shall be assessed fifty per cent of its *true and fair value in money.* In determining the true and fair value of real or personal property, the Assessor shall not adopt a lower or different standard of value because the same is to serve as a basis of taxation; nor shall he adopt as a criterion of value the price for which the said property would sell at auction, or at a forced sale, or in the aggregate with all the property in the town or district; but he shall value each article or description of property by itself, and at such price as he believes the same to be *fairly worth in money* at the time such assessment is made. *The true cash value of property shall be that value at which the property would be taken in payment of a just debt from a solvent debtor.*" (Italics ours.)

Appellants stress the last sentence above quoted and argue that this has a far stricter meaning than the ordinary definitions of "cash value," "market value," and "cash market value." They say:

"This can only mean the value at which property would pass from hand to hand in lieu of money. It must mean, not the meeting of willing minds, but the figure at which property would be taken in lieu of cash in payment of a debt."

Upon the basis of that argument, appellants conclude that the only value which a logging railroad possesses is the salvage value of its removable equipment. Respondent, in reply to that argument, charges appellants with failure to appreciate the fact that a *solvent* debtor would not permit his property to go in payment of a debt at less than its reasonable value to himself, and the further fact that the statute above quoted specifically prohibits the adoption as a criterion of value the price which the property would bring at auction or at forced sale. Respondent then avers that salvage value, being the lowest practical value, approximates the price at which the property would sell at auction or at a forced sale.

We need not determine the relative strength of these arguments, for our own decisions have placed a definite meaning upon this particular form of language contained in the statute. Since 1897, every law concerning assessments has included the specific sentence in question as the test of value for assessment purposes. See Laws of 1897, p. 155, § 42; Laws of 1913, p. 438, § 1; Laws of 1919, p. 393, § 4; Laws of 1925, Ex. Ses., p. 259, § 52. During these years, this court has had frequent occasion to construe the statute and has held that the sentence under consideration means "market value." *Spokane & I. E. R. Co. v. Spokane County*, 75 Wash. 72, 134 Pac. 688; *National Lbr. & Mfg. Co. v. Chehalis County*, 86 Wash. 483, 150 Pac. 1164; *Hillman's S. C. L. & R. Co. v. Snohomish County*, 87 Wash. 58, 151 Pac. 96; *Bellingham Community Hotel Co. v. Whatcom County*, 190 Wash. 609, 70 P. (2d) 301. In the *Hill-*

*man's* case, *supra,* this court, construing a statute having almost identical terms, said:

"The governing statute, Rem. & Bal. Code, § 9112 (P. C. 501 § 113), provides that 'all property shall be assessed at its true and fair value in money,' that the assessor shall value each description of property 'by itself, and at such sum or price as he believes the same to be fairly worth in money at the time such assessment is made,' and that 'the true cash value of property shall be that value at which the property would be taken in payment of a just debt from a solvent debtor.' *In its simplest terms, this means that property shall be assessed at its fair market value at the time the assessment is made.*" (Italics ours.)

■ The terms "market value" and "fair market value" have been defined by this court as meaning the amount of money which a purchaser willing but not obliged to buy the property would pay an owner willing but not obligated to sell it, taking into consideration all uses to which the property is adapted and might in reason be applied. *In re Westlake Avenue,* 40 Wash. 144, 82 Pac. 279; *Ham, Yearsley & Ryrie v. Northern Pac. R. Co.,* 107 Wash. 378, 181 Pac. 898; *Bellingham Community Hotel Co. v. Whatcom County, supra.*

■ The pertinent language of Rem. Rev. Stat., § 11135, having thus been construed to mean "market value," the crucial question here is as to how such value with reference to logging railroads may be determined for assessment purposes. The theories upon which the respective parties proceeded in the production of their evidence were widely divergent of each other. Appellants' theory was that the valuation to be placed upon the logging railroads was the amount of actual cash that could be realized from a sale of the removable equipment. Respondent's theory was that the valuation was to be determined from a

consideration of two factors: one, the cost of the railroads, less their depreciation; and the other, the use to which the property was adaptable and for which it reasonably could be employed.

Appellants concede that, in the absence of proof of "actual value and actual sales," proof of cost less depreciation is admissible to throw light on the question of value.

There was no proof in this case of sales of logging railroads that were going concerns at the time, but merely of sales of such railroads as had virtually ceased operations, with no prospect of their resumption. They were what might be termed "liquidation" sales. In such instances, of course, the immovable right of way improvements had lost their entire value, and only the removable equipment possessed any sale value. In the cases before us, we have an entirely different situation. These logging railroads are in active operation, with every prospect of steady continuance for a period of at least twelve years. They therefore possess a utility value far in excess of the mere salvage price of their removable parts. In determining the value of an active, operating logging railroad, it must be considered as a unit and not simply as an aggregation of separate parts; for the value of its separate parts, taken in the aggregate, would not necessarily approximate a true measure of value of all its parts viewed as a single organic machine or plant, so to speak. As stated in 1 Bonbright, Valuation of Property (1937), pp. 76-77,

"One of the most important but most frequently disregarded truths about value, is that only by a somewhat rare coincidence does the sum of the values of the different parts of an organic whole equal the value of the whole. If the parts are valued as *separated* from the whole, the sum of their values is likely to be far less than the value of the whole. . . . This

truth is well recognized when the comparison is between the value of the whole business and the separate *liquidation* values of the assets."

Appellants contend that to take into consideration any such value as has just been discussed would be to tax the *use* itself of the property, and in support of that contention they cite the case of *Samish Gun Club v. Skagit County,* 118 Wash. 578, 204 Pac. 181, as authority for the proposition that the use which is being made of property is not a proper subject of assessment for taxation. That case itself answers appellants' contention by pointing out that there is a distinction between utility value of property and the particular use to which it is presently put. The opinion reads, in part, as follows:

"Section 9102, Rem. Code (P. C. § 6939), provides, among other things, that all property shall be assessed at its true and fair value in money. In arriving at this value it is the generally accepted law in this state, as well as in other jurisdictions, that any use to which the property may be put may be taken into consideration, and if it is peculiarly adapted to some particular use, such fact may be taken into consideration.

"In applying this rule the assessor had the right to take into consideration the value of the property as a hunting preserve, if such use gave it an added value, but taking into consideration the use, either general or special, to which a property may be put in determining its value is a different thing from assessing the use which is being made of it."

In that case, this court set aside the assessment, but only because the assessment was upon the use itself, and not upon the land considered as being peculiarly adapted to some particular use. The case is authority for the position taken by the respondent assessor in the instant cases.

In *Woodburn v. Skagit County,* 120 Wash. 58, 206 Pac. 834, 30 A. L. R. 361, 95 A. L. R. 443, this court

upheld an additional valuation of property because of its utility value, or the value of the use, general or special, to which the property may be put. In that case, the plaintiff owned a farm, on part of which he had leased the hunting rights. The assessor determined that the land had considerable value for hunting purposes aside from its value as a farm, and added four thousand dollars on account of the hunting value. This court sustained the additional valuation, but lowered the amount merely because of a clerical error on the part of the assessor in figuring the percentage of assessed value to the true value of the property.

Appellants rely strongly on the case of *Grays Harbor Pac. R. Co. v. Grays Harbor County,* 188 Wash. 484, 62 P. (2d) 1347, to support their contention that the assessor in these cases used a fundamentally wrong basis of assessment. In the cited case, the state tax commission had singled out one particular logging railroad, the Grays Harbor Pacific Railway Company, and had classified it as a common carrier. In making its assessment against the railroad on the theory that it was a common carrier, the commission arrived at a value far in excess of that placed by the county assessor on other logging railroads in the same county. The trial court set aside the assessment. In affirming that judgment, however, this court said:

"The tax commission, in fixing the valuation of the company's property on the theory that it was a common carrier, proceeded on a fundamentally wrong basis. This, in itself, is not sufficient to justify the intervention of the courts at the instance of the taxpayer. But if the result of such procedure is an overvaluation which is palpably exorbitant and greatly disproportionate to valuations of property of like character in the same taxing district, the court will intervene and revalue the property."

That case is distinguishable from the instant cases, in point of fact, in several respects. In that case, the evidence showed, as stated in the opinion, that the tax commission in assessing the logging railroad as a common carrier had proceeded on a fundamentally wrong basis; that the valuations adopted by the commission did not represent the fair market value of the properties; and that the valuations were grossly excessive and utterly disproportionate to valuations placed upon properties of like character in the same taxing district. In the cases at bar, the appellants have not met the burden of showing by a clear preponderance of the evidence that the assessor adopted a fundamentally wrong basis of assessment; rather does it seem to us that the assessor was fully justified in adopting some method of assessment which would place upon active, operating concerns greater valuations than their mere salvage values. There was no showing that the county assessor proceeded upon the theory that appellants' railroads were common carriers; to the contrary, it appears that the assessor considered the logging railroads as private carriers. There was no showing that, upon the basis of the assessor's method of assessment, the valuations were palpably exorbitant and grossly excessive; the evidence afforded ample proof of the reasonableness of the method and its results. Finally, there was no showing that the assessment was greatly disproportionate to valuations of property of like character in the same taxing district; in fact, as appears from the evidence, the same basis for valuation was used with respect to appellants' properties as was used for all other logging railroads in Grays Harbor county.

In view of the fact that appellants' evidence failed to show proof of actual comparable sale values, the testimony presented merely a difference of opinion between appellants' witnesses and respondent's witnesses as to

the true value of the logging railroads, and as to the manner in which they should be assessed.

In *Dexter Horton Building Co. v. King County, supra*, we cited the case of *Adams County v. Northern Pac. R. Co.*, 115 F. (2d) 768, and quoted therefrom as follows:

"Valuation is an expression of opinion and judgment and the state law requires the exercise of that judgment by the Commission. As already shown, it is only when an erroneous method results in grossly excessive valuation that the courts may interfere with the Commission's valuation. For that reason much of the discussion in the briefs dealing with the comparative merits of the methods used by the Commission and the master is wholly immaterial."

See, also, *Baker Inv. Co. v. Pierce County, supra.*

We find no warrant in the record for interfering with the assessments as sustained by the trial court.

The judgments are affirmed.

MILLARD, ROBINSON, JEFFERS, and MALLERY, JJ., concur.