[No. 31537.   Department Two.   February 23, 1951.]

NORTHWEST CHEMURGY SECURITIES COMPANY, *Appellant,* v.
CHELAN COUNTY, *Respondent.*[1]

[1]Reported in 228 P. (2d) 129.

*Harvey F. Davis*, for appellant.

*Robert E. Conner* and *Norman L. Schwalb*, for respondent.

HAMLEY, J.—The purpose of these two actions, which were consolidated for trial and appeal, was to recover alleged excessive taxes, paid under protest, for the years 1947, 1948 and 1949.

The trial court dismissed the cause of action based upon the 1947 tax payment, for the reason that recovery was barred by the statute of limitations. Plaintiff concedes that this is a correct ruling, and has not appealed therefrom.

The trial court also dismissed the causes of action based upon the 1948 and 1949 tax payments. This was done upon the ground that the plaintiff had not proved the allegations of the complaints that the assessments for the years 1948 and 1949 taxes were excessive, arbitrary or capricious, or that they were illegal or confiscatory. Plaintiff has appealed from this ruling.

The property in question is a plant constructed and equipped in 1943 by appellant's predecessor, Northwest Chemurgy Co-operative. It occupies a site along the Columbia river, at Wenatchee, Washington. The purpose of the plant was to process wheat into glucose. The buildings consist of an old sawmill building which was converted into a starch plant; a box factory building, constructed in 1921, which was converted into a glucose plant; and several new buildings, including a wheat elevator of sixty-two-thousand-bushel capacity, a flotation house, and a shop and boiler building. The machinery and equipment was, for the most

part, specially built for the purpose for which it was used in the plant.

Initial manufacturing operations were started in May, 1944. This was an experimental undertaking, there being only one other plant in the United States built for the same purpose. This other plant is not now in operation. Changes, replacements, and additions of machinery and equipment were frequently made between 1944 and 1947, in an effort to develop the most efficient process.

The operation was profitable during the war years, when glucose was being used to a considerable extent as a substitute for sugar. One witness characterized the plant as "fundamentally a war baby." After the war, however, the price of glucose dropped very low. This, together with the fact that the plant was never successful in recovering the by-products of wheat, made the plant an unprofitable operation for peacetime.

On May 28, 1947, Northwest Chemurgy Co-operative filed a petition in bankruptcy, and on December 13, 1947, it was adjudged a bankrupt. The plant was shut down the latter part of July, 1947, and never operated thereafter. Appellant, on September 30, 1948, acquired title to the property from the trustee in bankruptcy in satisfaction of a mortgage lien.

The real property was assessed at $53,790, as of January 1, 1947, $1,610 of this representing land and $52,180 representing improvements. This assessment was increased to $55,400 as of January 1, 1948, due to a one hundred per cent increase in the assessment on the land, from $1,610 to $3,220. It was on the basis of these assessments that the questioned real property taxes for 1948 and 1949 were levied. The assessments in each case represent fifty per cent of the assessor's determination of valuation on those dates. The real property valuation fixed for January 1, 1947, was therefore $107,580, and the valuation fixed for January 1, 1948, was $110,800.

The personal property was assessed at $115,500, as of January 1, 1947, and $99,500, as of January 1, 1948. The

difference of $16,000 is accounted for by the fact that merchandise valued by the assessor at $32,000 had been disposed of prior to making the 1948 assessment. The assessments in each case represented fifty per cent of the assessor's determination of valuation on those dates. The personal property valuation fixed for January 1, 1947, was therefore $231,000, and the valuation fixed for January 1, 1948, was $199,000.

Appellant paid, under written protests, all of the 1948 and 1949 real and personal property taxes levied on the basis of the 1947 and 1948 assessments. The grounds stated in these protests were that the assessed valuations were grossly excessive, and that such assessments were arbitrarily and capriciously made, and were illegal, unlawful, and confiscatory. These allegations were repeated in appellant's pleadings in the actions thereafter instituted to recover alleged excessive taxes. The trial court, as indicated at the outset of this opinion, held that appellant had not proved the allegations of the complaints, and dismissed the actions.

All of the assignments of error relate to the primary question of whether, under the evidence and the law applicable thereto, appellant established its cause of action for recovery of a portion of its 1948 and 1949 tax payments.

■ Before a court of equity will grant recovery of taxes paid pursuant to an overassessment, it must clearly appear that the assessment is so palpably exorbitant and excessive as to amount to constructive fraud. *Ozette Railway Co. v. Grays Harbor County*, 16 Wn. (2d) 459, 133 P. (2d) 983, and cases there cited. This can be ascertained only by comparing the assessments actually made with those which should have been made under a proper application of the statutory rule governing assessments.

■ The statutory rule (Rem. Rev. Stat. (Sup.), § 11135) provides that all property shall be assessed at fifty per cent of its true and fair value in money. The statute sets out directions for the guidance of the assessor in determining the true and fair value, and provides that the "true cash

value" of property shall be that value at which the property would be taken in payment of a just debt from a solvent debtor.

This statute has consistently been construed to mean that property shall be assessed at its fair market value at the time the assessment is made. *Spokane & Inland Empire R. Co. v. Spokane County*, 75 Wash. 72, 134 Pac. 688; *National Lumber & Mfg. Co. v. Chehalis County*, 86 Wash. 483, 150 Pac. 1164; *Hillman's Snohomish County Land & R. Co. v. Snohomish County*, 87 Wash. 58, 151 Pac. 96; *Bellingham Community Hotel Co. v. Whatcom County*, 190 Wash. 609, 70 P. (2d) 301; *Ozette Railway Co. v. Grays Harbor County*, *supra*.

■ A number of factors may appropriately be considered in determining fair market value. Among these are original cost, estimated cost of reproduction less depreciation, and rental income (*Bellingham Community Hotel Co. v. Whatcom County*, *supra*); capitalization of income (*Dexter Horton Building Co. v. King County*, 10 Wn. (2d) 186, 116 P. (2d) 507); the uses to which the property is adaptable (*Ozette Railway Co. v. Grays Harbor County*, *supra*); the sale price of other properties (*Dexter Horton Building Co. v. King County*, *supra*); and the burdens and benefits attaching to the property (*Dexter Horton Building Co. v. King County*, *supra*).

Whatever factors are taken into consideration, it is important to bear in mind that the ultimate question for determination is always the same—what is the reasonable market value of the property at the time the assessment is made? As this court said, in *Bellingham Community Hotel Co. v. Whatcom County*, *supra*:

"The original cost of construction or the estimated cost of reproduction, less depreciation, may be considered, but only as an aid in arriving at the market value of the building." (p. 612.)

With these principles in mind, we turn to an examination of the evidence bearing upon the fair market value of the real and personal property in question.

The assessing officer testified that his determination of the value of the real property was based upon and represented the cost of the land and improvements, as shown on the books of the company. This would not appear to explain the one hundred per cent increase in the assessment on land, 1948 over 1947, but for present purposes that is immaterial. No consideration was given to depreciation, reproduction cost, capitalization of income, or any other factors except original cost. The deputy assessor made it clear that it was not the purpose or practice of his office, in fixing such valuations, to determine the fair market value of the property. His testimony on this, which is also applicable with respect to the personal property assessments to be discussed below, was as follows:

"Q. Mr. Kauffman, on what basis did you assess this property, what valuations—what basis did you use for the valuations that you placed on the property? A. You mean on personal or real? Q. On both of them. A. 50%. Q. 50% of true value or what? A. Of the cost value. Supposed to be the cost value. Q. What cost value? And how did you determine the cost value? A. Well, I got the information from their office; from their head bookkeeper, Mr. Murray. He opened his books up and gave me the figures right off his books and we took half of it. . . . Q. How does your 50% of cost compare with 50% of fair market value,—what property will sell for on the open market, Mr. Kauffman? A. Well, of course, we don't use that—what it sells for—at all. Q. You don't take that into consideration? A. We don't take that into consideration at all. . . . Q. You didn't try to relate your assessment at all to the market value? A. No, it was strictly taken from what they carried on the books."

With respect to the valuation and assessment of the personal property, the deputy assessor stated that in January, 1947, he went to appellant's office and obtained from the head bookkeeper the original cost of the machinery, equipment, and other personal property. The total of those items was then considered as the full valuation of such property, and one half of this sum was entered as the assessed value. This same figure was also used in 1948 as an "office" assessment.

The deputy assessor testified, as in the case of the real property valuations, that no account was taken of depreciation or other factors. His office made no contention that this original cost figure was intended to, or in fact does, represent fair market value. The pertinent testimony on this point has been quoted above.

Respondent offered no evidence in support of either the real or personal property assessments other than the deputy assessor's testimony. His testimony, as indicated above, did not touch upon the question of fair market value. The situation is therefore similar to that which confronted the court in *Inland Empire Land Co. v. Grant County,* 138 Wash. 439, 441, 245 Pac. 14, where we said:

"The first question to be determined is, whether or not there was an over-valuation of the property. There being no evidence offered by respondent upon this question, it must, of course, be determined wholly from the testimony of appellant's witnesses. . . . Appellant's testimony being undisputed, it is, of course, controlling upon the court."

Appellant presented three expert witnesses who testified as to the fair market value of the real property. John A. Gellatly testified that the land and buildings were worth thirty thousand dollars in 1947 and 1948, and added: "I wouldn't pay that for it." A. A. Van Divort testified that the market value of the land and buildings in those years was forty thousand dollars. J. A. Scaman testified that the fair market value of the land and buildings in those years was $86,240. These estimates of fair market value are to be compared with the valuations on which the assessments were based—$107,580 in 1947, and $110,800 in 1948.

It is to be noted that the estimate submitted by Scaman is only about twenty per cent less than the assessor's valuations. Appellant, however, invites us to disregard Scaman's estimate, even though he was one of appellant's witnesses. Appellant argues that an analysis of the testimony indicates that this particular estimate was intended to represent, not fair market value, but only Scaman's opinion of the value of the land, plus the reconstruction cost of the buildings on a square foot basis. Appellant points

out, among other things, that Scaman stated that he doubted very much whether the property could have been sold on the open market for that figure, "for the reason that it was a one-proposition plant."

Scaman testified that, in arriving at his opinion as to value, he figured on a square foot basis and what he considered the land to be worth, but did not take into consideration the use which could be made of the building. He did not specifically mention reconstruction cost, although that may have been what he had in mind.

■ Assuming that the opinion of the witness as to fair market value was based upon his estimate of reproduction cost, and recognizing that he did not take into consideration the use which could be made of the buildings, this nevertheless would not warrant disregard of Scaman's testimony. Fair market value is a matter of opinion. It is necessary for each witness who is called upon to express such an opinion to use his own judgment as to the appropriate factors to be considered under the particular circumstances of the case.

The inclusion or exclusion of individual factors, and the degree of emphasis which the witness accords to particular factors, are, of course, to be taken into consideration in evaluating the probative value of such opinion testimony. In this case, however, we have no basis for ruling that reconstruction cost was an inappropriate factor and that the use to which the buildings could be put was a necessary factor; and that therefore Scaman's testimony as to fair market value is entitled to little or no consideration.

Scaman had been a resident of the Wenatchee area for fifty-two years. He had been a real-estate broker and agent for twenty-five years. He had been manager of a savings and loan association for seven and a half years, and in this capacity made many loans on real property. He was familiar with the property in question and described it in detail, including its past history. He was presented by appellant as a qualified witness as to market value, and was conceded by respondent to be so qualified.

In our opinion, Scaman's opinion on the question of fair market value is not to be disparaged on the basis suggested

by appellant. The witness' expression of doubt as to whether the property could have been sold on the open market for the figure he submitted tends to indicate only that the figure was presented as a maximum estimate of market value.

Scaman's estimate of $86,240 was greatly in excess of the $30,000 and $40,000 estimates submitted by Gellatly and Van Divort. A possible explanation of this variance is that the two latter witnesses seemed to place great emphasis upon the susceptibility of the lands in question to river floods. Each of them examined the site after the high flood of June, 1948, and were apparently impressed with the amount of damage which had been done. They each expressed the view that a new purchaser would not be justified in using the property without first expending a considerable sum to protect it against the river. The evidence shows that the 1948 flood was the greatest since 1894. While flood waters had come part way up on the property several times during the past forty years, there is no indication that it had ever previously reached the buildings.

The trial court accepted Scaman's estimate of fair market value in 1947 and 1948, and we find nothing in the record which compels a different conclusion.

■ In our opinion, the assessor's real property valuation of $107,580 in 1947 and $110,800 in 1948 was not so palpably exorbitant and excessive, when compared to Scaman's estimate of $86,240, representing market value, as to amount to constructive fraud.

Appellant also presented three expert witnesses on the question of the fair market value of the personal property. Two of them were graduate engineers. All of them had been connected with this particular plant during the time it was in operation, and were thoroughly familiar with the machinery and equipment. All three witnesses were also men of wide experience in dealing with industrial machinery of this general nature. Their estimates of fair market value of the personal property on January 1, 1947, and January 1, 1948, as compared to respondent's valuations (and omit-

ting from the 1947 estimates and valuation, the value of manufactured products which were on hand on January 1, 1947 ($32,000), but were not on hand the following year) may be tabulated as follows:

| Witness | Valuations | |
| | 1947 | 1948 |
| --- | --- | --- |
| Austin L. Ward | $ 40,000 | $ 47,000 |
| Dean B. Jackson | 27,745 | 31,000 |
| Jess M. Scott | 50,000 | 30,000 |
| Average | 39,248 | 36,000 |
| Assessor | 199,000 | 199,000 |

Respondent urges that Ward's estimates for 1947 and 1948, as shown above, represented blanket guesses, and that, on cross-examination as to the value of individual items, he gave figures which add up to approximately $134,-000. Respondent argues that this latter figure should be accepted as Ward's real estimate of value. The trial court apparently accepted this view.

The record, however, discloses that, on this cross-examination, Ward was asked to give his estimate of the *original cost* of the individual items, and not (except as to several small items) his estimate of *value*. Neither he nor any other witness testified that fair market value should, under the circumstances of this case, be measured by original cost. At the conclusion of this itemization on cross-examination, Ward repeated his original estimate of total valuation of the personal property, as set forth in the above tabulation.

We do not believe that Ward's testimony as to valuation is subject to challenge on the basis suggested.

■ Constructive fraud, as before indicated, will not be implied except where the assessment is palpably exorbitant and excessive. There is no fixed rule as to the disparity required between the assessor's valuation and the value found by the court in order to establish constructive fraud. *Bellingham Development Co. v. Whatcom County*, 187 Wash. 15, 59 P. (2d) 920; *Dexter Horton Building Co. v. King County, supra.* Constructive fraud has been implied in a number of cases where the overvaluation was double, or more than double, the fair market value, and in some cases

where the divergence was less than this. Our past decisions on this point are interestingly reviewed in 12 Wash. L. Rev. 205.

It will be observed that, in the instant case, the assessor's valuation of the personal property is approximately four times the highest estimate of fair market value for 1947 and 1948. In our view, this margin of difference adequately establishes that the assessor's valuation was so palpably exorbitant and excessive as to amount to constructive fraud. The view expressed by this court in *Inland Empire Land Co. v. Grant County, supra*, with reference to real property valuations, is equally applicable in the case of personal property valuation. We there said:

"It seems plain that land assessed from two to four times its actual value presents a case of constructive fraud that requires the intervention of a court of equity to grant relief." (p. 442.)

The fact that appellant's head bookkeeper signed, under oath, the 1947 personal property detail list containing the figures which ultimately became the assessment for that year, is without significance. The affidavit was required by statute (Rem. Rev. Stat. (Sup.), § 11141). It vouched for the correctness and completeness of the list of property subject to tax, but was in no sense an acknowledgement that the valuation figures which were there entered by the deputy assessor were fair and proper. The assessment of personal property was, at this stage, entirely tentative, and was subject to review by the assessor. The list was not even signed by the assessor or deputy assessor.

It is our conclusion that the trial court should have granted recovery of 1948 and 1949 personal property taxes (based upon 1947 and 1948 assessments) paid in excess of the tax which could have been appropriately levied on assessments equal to fifty per cent of an $82,000 valuation in 1947 (Scott's estimate plus $32,000 representing value of manufactured products), and a $47,000 valuation in 1948 (Ward's estimate), including, as a part of such appropriate

tax, the interest and penalties properly applicable thereto, in view of the actual dates of payment.

Appellant urges that the assessor violated a fundamental principle of taxation when he used a ratio of fifty per cent of valuation for assessment purposes on appellant's property, "whereas, generally in Chelan county during the years involved, the ratio of assessment to valuation used by the assessor did not exceed 25%."

We believe that appellant misapprehends the deputy assessor's testimony. He stated unequivocally that the real and personal property in question and all other real and personal property in Chelan county was, in 1947 and 1948, assessed at fifty per cent of *cost*. Later, he was asked how these assessments generally (and this would include the property in question) compared, percentagewise, with the *market value* of such property. The witness answered:

"Of course, you've kind of got me there. That's a hard question. I expect a real estate man could answer that better than I could, but I would say probably about, oh, maybe 25%."

Later the witness indicated that this ratio might drop as low as fifteen or twenty per cent.

This testimony as to the ratio of assessments to valuation sounds more like a guess than an informed estimate. In any event, it affords no basis for the conclusion that the ratio of assessments to valuation was greater in the case of the property in question than for Chelan county property generally. The witness drew no distinction between the ratio as applied to appellant's property and as applied to the other property throughout the county.

The judgment is reversed, and the cause remanded with instructions to enter a judgment in accordance with this opinion. The trial court may, in its discretion, reopen the consolidated causes for the purpose of taking additional testimony bearing upon the amount of the judgment to be entered in conformity with this opinion.

SCHWELLENBACH, C. J., MALLERY, ROBINSON, and GRADY, JJ., concur.