[No. 2155–3. Division Three. February 15, 1979.]

THE TRANS WEST COMPANY, *Respondent,* v.
KLICKITAT COUNTY, *Appellant.*

*L. Eugene Hanson, Prosecuting Attorney,* and *Elmer E. Johnston, Jr., Special Deputy,* for appellant.

*Johnson, Lane & Gallagher, Edward M. Lane,* and *John P. O'Conner,* for respondent.

GREEN, C.J.—The Trans West Company, Inc., brought this action seeking a refund of real estate taxes paid under protest to Klickitat County, for the years 1972, 1973 and 1974. From a judgment granting the refunds, Klickitat County appeals.

Trans West is the sole general partner in 13 Washington limited partnerships. It exercises management authority in each of the limited partnerships for an agreed fee and shares in the profits. The Articles of Incorporation of Trans West authorize it to engage in the business management of real estate and all related businesses and in connection therewith to "own, buy, sell, lease, develop, subdivide,

improve, operate and otherwise use" all types of improved and unimproved real property as principal or agent. The purpose of the limited partnerships, as expressed in the offering circulars, is to purchase land for investment.

Prior to November 29, 1971, Trans West purchased from various owners on behalf of its limited partners nearly 18,000 acres of land near Goldendale. This land lies between 2,000 and 4,600 feet above sea level in what is described as a semi-arid region. A majority of the land is tree covered, primarily with merchantable Ponderosa pine, having considerable potential commercial value. The remaining land is suitable for open grazing, but is not suitable for cultivation. With certain exceptions, none of the properties are served by public roads, electricity, telephone, water, sewer or other utility services. At the time of these purchases, the land had been variously classified by the county assessor as timber or agricultural land and the assessed values were based on these classifications.

Trans West purchased this land, planning to sell portions of it in 5-acre and 20-acre tracts. Accordingly, in 1970 it undertook to survey, subdivide, and advertise for sale about 2,700 acres known as "King Ranch" and "Satus Pass." Trans West announced plans to construct a clubhouse for the use of residents of various surveyed lots. Its advertising and statements to the local Chamber of Commerce claimed the property was located in an outstanding recreational area, ready for development. It began to sell land in the surveyed area, which it had purchased for $43 to $187 per acre, for $250 to $1,691 per acre for recreational and residential use.

Except for the surveyed land, the land retained the same physical character as it had prior to its acquisition by Trans West. The timber land was still growing timber and the agricultural land was still being used for grazing. In fact, portions of the property were leased back to the former owners for grazing purposes.

The assessor, observing the activity on the surveyed land, reclassified all of the Trans West land from timber or agricultural to recreation and increased the assessed values. The only exception was 2,080 acres that retained its agricultural classification through the assessor's oversight. Trans West paid the increased taxes under protest, exhausted its administrative remedies and then brought this action, seeking a refund with respect to all taxes except those paid on the 2,080 acres of land not reclassified and on the land that had been surveyed and subdivided for sale. The trial court granted the refunds and directed the assessor to reassess the property. Klickitat County appeals.

The basic question before the trial court was whether the assessor properly reclassified the Trans West land from timber and agricultural to recreation. In essence, the assessor based the reclassification upon the following facts: (1) Trans West was a developer and speculator in land; (2) Trans West surveyed, subdivided and sold a portion of the land for recreation and residential purposes; (3) Trans West engaged in extensive advertising of the property as recreation land; and (4) Trans West did not actively engage in restocking, forest management, fire protection, insect and disease control, cutting or harvesting the timber as required for designation of the land as forest land under RCW 84.33.130.[1] The trial court in substance held that the assessor erred in reclassifying the land based upon the

---

[1]RCW 84.33.130 provides:

"(1) An owner of land desiring that it be designated as forest land and valued pursuant to RCW 84.33.120 as of January 1 of any year commencing with 1972 shall make application to county assessor before such January 1.

"(2) The application shall be made upon forms prepared by the department of revenue and supplied by the county assessor, and shall include the following:

"(a) A legal description of or assessor's tax lot numbers for all land the applicant desires to be designated as forest land;

"(b) The date or dates of acquisition of such land;

"(c) A brief description of the timber on such land, or if the timber has been harvested, the owner's plan for restocking;

"(d) Whether there is a forest management plan for such land;

"(e) If so, the nature and extent of implementation of such plan;

"(f) Whether such land is used for grazing;

status or intent of the owner and the few sales occurring in the surveyed and subdivided land. In its determination, the court found that lands contiguous to the Trans West land retained their classification as timber or agricultural land, even though their actual use or physical condition was the same as the Trans West land. Further, the court found that much of the Trans West land was under lease to the former owners and used by them in the same manner as they used it prior to their sale to Trans West. Finally, the court held it was improper to apply the criteria contained in RCW 84.33.130 for designated forest land in determining whether the highest and best use of the Trans West land was for timber and agriculture or for recreation.

First, the county contends the court erred in holding that the criteria contained in the designation statute, RCW 84.33.130, do not govern the question of whether the highest and best use of the land was for timber and agriculture or for recreation. The county argues that it is clear that Trans West did not intend to use the land as timberland because it had no forest management plan, nor was there

"(g) Whether such land has been subdivided or a plat filed with respect thereto;

"(h) Whether such land and the applicant are in compliance with the restocking, forest management, fire protection, insect and disease control and forest debris provisions of Title 76 RCW or any applicable regulations thereunder;

"(i) Whether such land is subject to fire patrol assessments pursuant to RCW 76.04.360;

"(j) Whether such land is subject to a lease, option or other right which permits it to be used for any purpose other than growing and harvesting timber;

"(k) A summary of the past experience and activity of the applicant in growing and harvesting timber;

"(l) A summary of current and continuing activity of the applicant in growing and harvesting timber;

"(m) A statement that the applicant is aware of the potential tax liability involved when such land ceases to be designated as forest land;

"(n) An affirmation that the statements contained in the application are true and that the land described in the application is, by itself or with other forest land not included in the application, in contiguous ownership of twenty or more acres which is primarily devoted to and used for growing and harvesting timber. The assessor shall afford the applicant an opportunity to be heard if the application so requests."

any evidence of restocking, thinning, logging, spraying for disease or roadbuilding for fire access and logging. Further, Trans West had no past experience and activity in growing and harvesting timber. In short, Trans West was not using the property as required by the designation statute.

Initially, we note that in 1971 the legislature provided a new method of taxing timber lands and timber. RCW 84.33. Previously, standing timber had been taxed as realty. Under the new act, an excise tax is imposed on the timber when cut and the land is taxed separately as "forest lands." The underlying purpose to be served by the act is expressed in RCW 84.33.010(1):

> The public welfare requires that this state's system for taxation of timber and forest land be modernized to assure the citizens of this state and its future generations the advantages to be derived from the continuous production of timber and forest products from the significant area of privately owned forests in this state. It is this state's policy to encourage forestry and restocking and reforesting of such forests so that present and future generations will enjoy the benefits which forest areas provide in enhancing water supply, in minimizing soil erosion, storm and flood damage to persons or property, in providing a habitat for wild game, . . . in maintaining land areas whose forests contribute to the natural ecological equilibrium, and in providing employment and profits to its citizens and raw materials for products needed by everyone.

"Forest land," as defined in the act,[2] may be either classified, RCW 84.33.020, or designated, RCW 84.33.130. The relationship between classification and designation is summarized in *Wright v. Woodard,* 83 Wn.2d 378, 380, 518 P.2d 718 (1974):

---

[2]RCW 84.33.100(1) provides:

"'Forest land' is synonymous with timberland and means all land in any contiguous ownership of twenty or more acres which is primarily devoted to and used for growing and harvesting timber and means the land only."

RCW 84.33.030(2) states:

"'Timber' means forest trees, standing or down, on privately owned land, . . ."

When the land has no higher or better use than as forest land and is being primarily used for the *growing* of timber, it is to be classified and valued at the timberland values established by the Department of Revenue (RCW 84.33.110, .120(1) and (2)). *When lands being used for timber production have a higher and better use on the assessment date, they must be valued and assessed accordingly, unless the owner requests and is granted designation under RCW 84.33.130.* If he succeeds in having his land designated as "forest lands," that use must be maintained or he will be required to pay a compensating tax under RCW 84.33.140. If lands are classified as forest lands by the assessor, under RCW 84.33.120(2), no compensating tax is imposed if they are converted to another use.

(Italics ours.) Here, Trans West had not applied for designation when the assessor undertook to utilize the designation criteria in his reclassification of the Trans West land. The trial court's holding that it was error for the assessor to use the designation criteria to determine the highest and best use of the property was correct. It is only where the assessor properly classifies timberland to a higher and better use that the designation statute may become operative. By classifying the land to a higher use, the taxpayer loses the tax benefits of RCW 84.33, *e.g.,* deferring payment of the tax on the timber until it is cut. The taxpayer can avoid this consequence by applying to have the land designated as timberland. However, to obtain this designation, the taxpayer must establish that his use of the land is to husband the land for timber purposes as required by RCW 84.33.130. The legislature has seen fit to establish these stringent requirements in order for an owner to reap the tax benefits of designation because the land actually has a higher and better use than for timberland. We do not have that situation in this case. Consequently, the county's argument on use must be rejected.

Second, the county contends the trial court erred in finding its reclassification of the Trans West land to recreation to be unjustified and erroneous. We find no error. For years, the property in question had been classified by the

assessor as timber or agricultural land. RCW 84.33.020 provides:

> *Lands not heretofore so classified,* which are primarily devoted to and used for growing and harvesting timber are hereby classified as lands devoted to reforestation and such lands and timber shall be taxed in accordance with the provisions of this chapter . . .

(Italics ours.) Even if the property had not been previously classified as timberland, it has been used for the growing of substantial amounts of merchantable timber. That the assessor had correctly classified the property in prior years is confirmed by Trans West's subsequent sale of a substantial portion of this property to Talmo, Inc., a company that is at the present time actively harvesting timber from it. The only question before the assessor was, "Is there a higher or better use for the property as determined by the market place?" The assessor answered in the affirmative and reclassified the land as recreation. The trial court, after hearing the evidence, held the evidence was insufficient to support the reclassification because it was based solely on (1) the status and intent of the owner, and (2) sales of a relatively small amount of surveyed and subdivided land.

It is not the status or intent[3] of the owner that determines the highest and best use of land in the marketplace. It is how a willing buyer and seller would regard the land for purposes of sale in a free and open market. Nothing in the record reflects a market demand for about 15,000 acres of unsurveyed land for recreational purposes in the Goldendale area. The fact that Trans West sold a portion of the surveyed parcels for recreational purposes is not sufficient evidence of a market demand for the remaining unsurveyed acreage. In fact, the evidence establishes that

---

[3]The county cites three cases which hold that the taxpayer's intent is a proper area for the assessor's inquiry in determining whether a chattel has become a fixture. *Lipsett Steel Prods., Inc. v. King County,* 67 Wn.2d 650, 409 P.2d 475 (1965); *Kane v. Timm,* 11 Wn. App. 910, 527 P.2d 480 (1972); *Department of Revenue v. Boeing Co.,* 85 Wn.2d 663, 538 P.2d 505 (1975). We do not believe this rationale logically extends to the classification procedure at issue here.

this sales program was aborted because of governmental regulations and lack of buyers. As to the unsurveyed land, the only act Trans West engaged in was advertising its aspirations for development of the land for recreation. The market did not respond and Trans West eventually sold a substantial portion of the acreage to Talmo, Inc., a timber company. A seller's hope of finding a higher and better use for the land through advertising and offering for sale does not by itself establish a market for that higher possible use. There must in fact be a market demand for it. The record in this case would not support a finding of a market for recreational use. Thus, the assessor erred in seizing upon Trans West's mere aspirations for the property as its basis for reclassification. The record illustrates the error of the assessor's reasoning. After the reclassification, Trans West traded land to Boise Cascade in return for other land. The Trans West land in Boise Cascade's hands was reclassified from recreation to timberland and the Boise Cascade land in Trans West's hands was reclassified from timberland to recreational land.

The proper criteria for determining highest and best use are set forth in WAC 458–40–030:

In determining whether the value of a parcel of forest land for other purposes is greater than its value for use as forest land, the assessor shall consider, among other things, such factors as: (a) the record of the extent, nature and primary changes, if any, in land use which have occurred in the immediate vicinity; (b) suitability for other uses of the soil and topography; (c) availability for other uses by reason of public services such as roads, sewers and domestic water supply; (d) the history of the use to which the owner has applied the land and his plans as to its use within the foreseeable future; (e) the benefits to the public described in RCW 84.33.010 which would result from continued use of the land for growing and harvesting timber. After taking such factors into account, if the land value for other uses is not greater than its value for use as forest land, the owner shall not be required to apply for designation, and the assessor

shall classify the land as forest land pursuant to the provisions of RCW 84.33.020 and 84.33.120.

While this regulation indicates the owner's plans for the property may be considered, those plans must be feasible. WAC 458-12-330 specifically states:

> Uses which are within the realm of possibility, but not reasonably probable of occurrence, shall not be considered in estimating the highest and best use.

Here, the surveyed lands constituted only a small portion of the Trans West holdings, and, as we noted above, the sales program as to those lands was aborted. The focus of the regulation is not so much on intent, but on practical use of the land as reflected by a market demand. In any event, it does not appear that the county considered these factors in deciding to reclassify.

■ Third, the county contends that the assessor's determination is entitled to a presumption of correctness even though the determination may have proceeded on a fundamentally wrong basis.

RCW 84.40.0301(1) provides:

> Upon review by any court, or appellate body, of *a determination of the valuation* of property for purposes of taxation, it shall be presumed that the determination of the public official charged with the duty of establishing such value is correct but this presumption shall not be a defense against any correction indicated by clear, cogent and convincing evidence.

(Italics ours.) We note that the presumption favors the assessor's *valuation* of the property, not his *classification* of the property's highest and best use. However, the county points out that the mere fact that the assessor may have proceeded on a fundamentally wrong basis is not sufficient to overcome the presumption. The taxpayer must establish by clear, cogent and convincing evidence that the valuation is so palpably exorbitant and excessive as to amount to a constructive fraud or to violate some constitutional principle, or that the valuation is greatly disproportionate to valuations of property of like character in the same taxing

district. *Ozette Ry. v. Grays Harbor County,* 16 Wn.2d 459, 133 P.2d 983 (1943); *Alaska Land Co. v. King County,* 77 Wn.2d 247, 248, 461 P.2d 339 (1969).

We are of the view the presumption has been overcome in this case. The assessor, by improperly applying the designation criteria of RCW 84.33.130, determined the land could not be classified as timberland, thereby depriving Trans West of the tax benefits conferred by RCW 84.33. It is self–evident that this error resulted in disproportionate valuations.

■ Fourth, the county contends the trial court erred in ordering a refund of all of the taxes paid plus interest. It argues that the amount of the refund should be the difference between the reassessed tax and the tax paid plus interest on the difference. We believe that this is a proper interpretation of RCW 84.68.030:

> In case it be determined in such action that said tax, or any portion thereof, so paid under protest, was unlawfully collected, judgment for recovery thereof and lawful interest thereon from the date of payment, together with costs of suit, shall be entered in favor of plaintiff.

To the extent the county collected taxes in excess of those due upon a proper assessment, and to that extent unlawfully collected, Trans West is entitled to a refund, with interest, of the excess tax.

In view of our disposition of these issues, we need not reach the remaining contentions of the parties.

Therefore, we remand this case to the trial court with directions that it order the county to promptly reassess the property. The court shall thereupon determine the correctness of the reassessment and order a refund of the excess tax paid, with interest.

MUNSON and MCINTURFF, JJ., concur.

Reconsideration denied April 6, 1979.

Review denied by Supreme Court June 15, 1979.