[No. 36126.   Department One.   August 8, 1963.]

MASON COUNTY OVERTAXED, INC., *et al.*, *Appellants*, v. THE COUNTY OF MASON *et al.*, *Respondents.**

*Brodie & Fristoe*, for appellants.

*Reported in 384 P. (2d) 352.

*Bryon E. McClanahan, The Attorney General, Henry W. Wager* and *James A. Furber, Assistants,* for respondents.

HALE, J.—There are few things of which the courts may take judicial notice, but of one we are certain—the beauty and charm of the Hood Canal country of Mason County. It is a place set apart by a shining inland sea that sweeps southward at the feet of the snow-mantled Olympics then curves to the north through towering hills of fir, hemlock, spruce and cedar, to be met by lush carpets of salal, huckleberry, fern, alder, rhododendron and the luxuriant wild shrubbery of the country. A wide reach of water, dappled with quiet coves and inlets, it is ever-changed and changing by the swift-flowing, sometimes peaceful, sometimes turbulent, Skokomish, Lilliwaup, Hamma Hamma, Duckabush and Dosewallips that enter it. Marked by broad and friendly beaches, flanked to the east by the rugged, eternal peaks of the Cascades and the verdant San Juan Islands to the north, it is truly a land of charm and beauty. We take no risk in pronouncing it a place of enchantment.

Came one day into this verdant place, the assessor of Mason County in 1958, and, struck by the wonder of it all, he did what any assessor would do, he promptly raised the taxes in this wonderland.

It was not the increase, but rather its sudden and dramatic nature which invited this litigation, for the assessments increased with startling abruptness.

Mason County Overtaxed, Inc., a nonprofit corporation, organized by residents and taxpayers of the Hood Canal area, and numerous other residents and taxpayers of that district individually, bring this action to challenge the real-estate tax assessment of 1959, on Hood Canal beach properties in Mason County, on the grounds that such assessments were arbitrary, capricious, confiscatory and inequitable. They seek a decree that a reassessment of the affected properties be ordered. That they have both a legal and emotional basis to their claims is evident in their proof that, in 1959, the assessor of Mason County increased the assessments on waterfront property along Hood Canal from

79.17% on one tract to 4900% on another. Increases of 400% and 500% were commonplace.

One cannot say that this was taxation without representation for the redoubtable taxpayers speedily mobilized to vigorously present their views to the assessor, the Mason County Board of Equalization, the State Tax Commission and the courts. The 1959 assessment is not directly involved in this appeal, as the taxes for that year had, in most instances, been paid without protest. Assessments for 1960, though, were practically identical with those of 1959, except for minor changes prescribed by the State Tax Commission. Conditions precedent to maintain this as a class action for the benefit of Hood Canal area property owners have been fulfilled for the year 1960.

Some 37 taxpayers testified on plaintiffs' behalf as to the increases in their 1959-60 assessments, and described all of those factors pertaining to land which work against the increases. Abstracts of their testimony give us samples of the abrupt and drastic nature of the increase; the property will be identified by use of the owner's last name. Thus, a Fahey parcel was raised from an assessed value of $15 to $750, an increase of 4900%; Rendsland's property from $80 to $1,620, an increase of 1925%; Staley's tract jumped from an assessment of $440 to $1,980, a raise of 350%, and Hoglund's went up 542.86%, from an assessment increase from $315 to $2,025.

James's land went from an assessment of $160 to $2,760, or an increase of 1625%; Johnson's property went from $985 to $5,750, up 483.76%; Ryan's assessment increased 288.88%, from $360 to $1,400; and Kuhn's property was boosted from $75 to $1,400, a jump of 1766.66%; Slott's assessment went from $290 to $1,890, up 551.72%; and, finally, Pattison's assessment increased from $820 to $4,340, a rise of 429.27%. These are random samples, but give a reliable picture of the drastic rise in real-estate assessments on Hood Canal in the years 1959 and 1960. The foregoing figures represent but one-fifth of the assessor's estimate of the market values, as he derived them from appraisals

to fix the market values and actually assessed at 20% thereof.

The plaintiffs sought to support their claims for relief and a new assessment by showing many disparities in the Mason County assessments for the years 1958, 1959 and 1960. They showed that the over-all assessed value for Mason County increased only 10%, including the city of Shelton, the largest urban community in the county, and that farm lands and timberlands had increased only 100%. Yet, a particular sale of timber having the assessor's estimate of $12,000 market value actually sold in 1958 for $65,000. They showed that the assessor's figures carried a drop in market value of timberlands from $28.52 in 1955 to $15 per acre in 1959, whereas the market values of timberlands in neighboring counties were, for example, Grays Harbor, $79.80; Jefferson, $35.51; Pierce, $100.36; and Pacific, $46.36. They showed extreme variations in appraised values among their own waterfront properties.

Much of the evidence submitted to support the plaintiffs' case had to do with the sentimental value of their properties. Many witnesses testified that they had acquired land on Hood Canal years before, looking ahead to the time of their retirement or to their children's future. The property to them had values not measurable in dollars when related to the idea of their place as a home for their children and a haven for their grandchildren. They pointed out that no value in dollars and cents could be placed on their labors in building bulkheads, cutting trees, filling in and leveling irregular areas, shaping, contouring and clearing the land to make it habitable. They were indignant that so much labor and expenditure of money be rewarded by a great hike in their taxes—a hike apparently not shared by large sections of Mason County.

Strangely enough, plaintiffs had little or no knowledge of the amounts actually paid for waterfront property on Hood Canal in recent years, as they took little or no note of such transactions. They were not interested in current market values for they had little interest in selling and would be unwilling to discuss prices if overtures were

made; nor were any qualified, disinterested appraisers produced to give opinion as to the actual market value of their land. Unwilling to put a market price on their own properties, they rested their case largely on the tremendous increases in assessments, the minor or moderate increases elsewhere, and their conclusions that the assessor had been arbitrary and capriciously motivated. They showed the unfairness of it all by pointing to one sale for $14,000 that actually took place after being appraised by the assessor for $26,500.

The assessor sought to explain these increases in assessments and to meet the charges that they were arbitrary, capricious, and discriminatory, by proof that he had followed the direction of the statutes in making them. He pointed out that, under the provisions of Laws of 1955, chapter 251, p. 1027 (RCW 84.41.030), he was required (§ 3) to commence not later than January 1, 1956, and to complete before June 1, 1958, a comprehensive program of revaluation of all property in Mason County. This legislation required physical inspection of all property taxed, directed the assessor to budget for sufficient employees to do the job, and provided special help from the State Tax Commission. Section 11 of the act permitted the assessor to employ professional appraisers or to borrow their services from the State Tax Commission (RCW 84.41.060), but expressly declared that their valuations be deemed advisory only and not binding upon the assessor (RCW 84.41.110). The duty to make the evaluations was thus declared nondelegable and placed squarely upon the assessor.

Testimony produced by the assessor showed he had commenced reassessment of the entire county in 1951 on first taking office. In 1953, he started on farm appraisals, two crews from his office being then engaged in physical inspections, measurements and the noting of improvements and remodelings. From 1953 on, he has kept from 7 to 11 persons working on appraisals and inspections of land, including timber cruising and the classifying of timberlands according to growth maturity. His county has a total area of 400,000 acres.

The assessor gave the court a comprehensive picture of his activities. After 1955, city platted property increased 10% in assessment; and improved unplatted lands increased in assessment from $426,150 in 1955, to $2,112,000 for 1960. He increased the assessment over 100% on improved, unplatted lands in this period, raising the appraisal average from $40 to $88.55 per acre.

The assessor gave detailed evidence of his methodology in assessing the waterfront real estate here involved: laying out detailed maps of the area; making a study of the size and shape of each parcel of land and a study of prices based on recent sales of comparable land in the vicinity; personal physical inspection of each parcel of land by the assessors; comparing all of these with the opinions of others; and a final appraisal at fair market value.

He said that his office had a mass of detailed information to help him as they made a practice of recording the price of all land sales of waterfront property, and he had studied several hundred sales made within 2 years of the 1959 appraisals. He said that his office made a practice of talking to both buyers and sellers concerning these sales, but didn't learn much from these interviews as people were singularly reluctant to discuss their transactions with the assessor.

As to waterfront property, the assessor said that he knew the changes in value would be great, but each piece had to be valued on an individual basis, so special forms were prepared containing the exact legal description of each parcel. His field men actually measured many of the lots if there was any question about dimensions. His maps, at a scale of 1 inch to 400 feet, showed topographical changes and carried other pertinent data. Codes indicated the slope to the beach to show whether it was level, medium or steep; access to the beach was described; distances and access to a public road and elevation of the roadway were noted; kind and quality of the beach, degree of slope to the lot, and heights of bulkheads, if any, all were noted and given consideration as affecting the market value. In short, he stated that he gave thought to all of the things that go to make up a price between a willing buyer and willing seller.

He pointed to examples where he appraised one tract at only $20 per front foot because the bank at the beach was 100 feet high. Another strip, appraised by him at $15 per front foot, had no building site between the road and the beach so that the owner could reclaim the land only by building a bulkhead and backfilling to erect a house on it. Values varied greatly even among properties in the same vicinity and sometimes adjoining each other. He summarized his views by asserting that the great jump in appraised value was due to gross under-valuations of these properties prior to 1958, accompanied by marked increases in value of Hood Canal property year by year, all made evident by repeated sales of properties in this area at ever-increasing prices.

We have condensed the evidence of all parties upon which plaintiffs asked the trial court to vacate the 1960 assessment and order a new one. Was it error for the court to decline and thereupon dismiss their claims?

Although the valuation of property is, in the last analysis, an expression of opinion, the statute gives the assessor little latitude in determining the meaning of value. RCW 84.40.030 states:

"All property shall be assessed fifty percent of its true and fair value in money. In determining the true and fair value . . . the assessor shall not adopt a lower or different standard of value because the same is to serve as a basis of taxation; nor shall he adopt as a criterion of value the price for which the said property would sell at auction, or at a forced sale, or in the aggregate with all the property in the town or district; but he shall value each . . . description of property by itself, and at such price as he believes the same to be fairly worth in money at the time such assessment is made. The true cash value of property shall be that value at which the property would be taken in payment of a just debt from a solvent debtor. . . ."

■ The purpose of the foregoing statute is clear; it enjoins the assessor to determine the true and fair value of the property in money. Expressed otherwise, he shall make his assessment upon the market value. Market value means the amount of money which a purchaser willing, but

not obliged, to buy would pay an owner willing, but not obligated, to sell, taking into consideration all uses to which the property is adapted and might in reason be applied. *Ozette R. Co. v. Grays Harbor Cy.*, 16 Wn. (2d) 459, 133 P. (2d) 983.

This definition of market value, taken in conjunction with the assessor's duty to appraise each parcel of property separately upon its individual merits, leaves no room for sentiment or consideration for the personal feelings, hopes and aspirations of the owners. The assessor cannot yield to whatever gentler impulses may move him when he makes his appraisal. He can give weight only to those factors which could reasonably be said to affect the price in negotiations between a willing seller and a willing buyer.

That controversies between taxpayers and assessors are of long standing in this jurisdiction is evident from the first case to discuss the subject. *Andrews v. King Cy.*, 1 Wash. 46, 23 Pac. 409 (1890), where it was held that

". . . while equity will not interfere to correct mere mistakes or inadvertencies, or to contravene or set aside the judgments of assessors or boards of equalization in relation to values, it will interfere when the officers fraudulently, capriciously or tyrannically refuse to exercise their judgment by adopting a rule or system of valuation designed to operate unequally . . ."

And, two years later, in *Whatcom Cy. v. Fairhaven Land Co.*, 7 Wash. 101, 34 Pac. 563, this court first alluded to the doctrine of constructive fraud to distinguish it from a mere over-valuation saying:

"An arbitrary assessment of property without the exercise of the assessor's judgment, based upon knowledge or information, is an illegal assessment, and is a fraud upon the property owner . . . But we do not think there was evidence . . . of constructive fraud, and shall decide it as merely one of palpably excessive over-valuation."

Eleven years later, a substantial body of law having developed on the subject, the court collected and analyzed the major decisions in this manner:

". . . Fraud on the part of the assessing officer may be presumed from a palpably excessive or exorbitant over-

valuation. The court will grant relief for an arbitrary, fraudulent, or malicious excessive valuation by the assessing officer. Where the assessing officer has exercised an honest judgment, and no fraud or arbitrary or capricious action in making the assessment is shown or can be presumed, the court will not interfere. Where it appears that the assessing officer endeavored honestly to get at the true value, and there is an honest difference of opinion as to the value, the judgment of the officer is conclusive. . . ." *Templeton v. Pierce Cy.*, 25 Wash. 377, 65 Pac. 553.

Again the cases on this subject were collected and studied in *Bellingham Community Hotel Co. v. Whatcom Cy.*, 190 Wash. 609, 70 P. (2d) 301, and the rule again declared:

" ' "It is the established law in this state that courts will grant relief from a grossly inequitable and palpably excessive over-valuation of real property for taxation as constructively fraudulent, even though the assessing officers may have proceeded in good faith . . ." ' "

■ Constructive fraud, then, as it applies to the assessment of real estate, has, as its principal ingredient, the grossly excessive over-valuation of the property, *i.e.*, a fictitious value far higher than its true market value. A sudden and abrupt increase in real-estate assessments, without more, is as consistent with a preceding under-valuation, as it is with the idea of a current excessive valuation. In either event, the true yardstick is market value as of the assessment day.

And it is here that the plaintiff's case falls, for there is virtually no evidence that the assessor did not conscientiously strive to reach market value. Consider his employment of detailed maps, the constant studies of current sales, his comparison of one tract with another, his physical inspections of each parcel, his analysis of all of those features of the terrain and topography which affect market value, and the application of his experience and training coupled with his knowledge of the recent history of real-estate values, and we see that he fully met the requirements of his job. We would be hard put to suggest additional methods.

We think that the learned trial judge lucidly said this in his oral memorandum opinion, summing up at the close of the trial, when he said of the plaintiffs:

" . . . They are faced first with the principle of law that when a public official has performed a public duty it will be presumed that he has done it right, and the burden is entirely upon the person who seeks to attack his action to prove that it is not right and that it is in fact wrong. That's the law. The other principle involved is that that burden has to be met by evidence that's convincing. If it's close, if there is doubt on the fact as to who may be right or wrong, the decision must be in favor of the public official's action."

Over-valuation was thus not proved; claims of constructive fraud, leveled against the assessor must fall. *Northwest Chemurgy Sec. Co. v. Chelan Cy.*, 38 Wn. (2d) 87, 228 P. (2d) 129; *Ozette R. Co. v. Grays Harbor Cy., supra.*

The plaintiffs are thus left where the trial court left them when judgment of dismissal was entered.

The judgment is in all respects affirmed.

OTT, C. J., ROSELLINI, and HUNTER, JJ., concur.

HILL, J. (concurring specially)—The statute requires "All property shall be assessed fifty percent of its true and fair value in money." RCW 84.40.030. There is no convincing evidence that any of the property with which we are concerned was assessed at more than "fifty percent of its true and fair value in money." The increases in assessed valuation of which complaint is made, and whatever the percentage of increase, seem to have no more than brought the assessed values of the property a little closer to the level required by the statute. I find no evidence of lack of uniformity. The complaints against the assessor by the plaintiffs are without foundation. For these reasons I would affirm the order of dismissal entered by the trial court.