[No. 40868.   En Banc.   September 4, 1969.]

GEORGE J. CARKONEN *et al., Appellants,* v. MELVIN J. R.
WILLIAMS *et al., Appellants,* GEORGE
KINNEAR, *Respondent.**

*Reported in 458 P.2d 280.

*Schweppe, Doolittle, Krug & Tausend, Alfred J. Schweppe, Robert R. Beezer,* and *David G. Knibb,* for appellants Carkonen et al.

*Charles O. Carroll, James E. Kennedy, William L. Paul, Jr., Robert E. Schillberg,* and *Elmer E. Johnston, Jr.,* for appellants Williams et al.

*The Attorney General, Timothy R. Malone* and *Henry W. Wager, Assistants,* for respondent.

*John Spiller,* amicus curiae.

HAMILTON, J.—Plaintiffs, as residents and taxpayers in King and Snohomish Counties, State of Washington, and for the most part property owners within the boundaries of Northshore School District No. 417, a bicounty district, on behalf of themselves and other taxpayers similarly situated, initiated this action against their respective counties, county assessors, and county treasurers seeking relief from 1967 real property taxes paid under protest. They predicated their claim for relief upon allegations that the 1966 property valuations, upon the basis of which the 1967 taxes were levied, were unconstitutionally discriminatory,

unequal, and lacking in uniformity within and between the two counties, and within the bicounty school district, thereby giving rise to unequal and nonuniform tax exactions. Plaintiffs asserted the alleged lack of uniformity, inequality, and discrimination were attributable to the failure of the respective county officials to assess properties within their counties at the constitutionally prescribed 50 per cent of true and fair value[1] and to properly pursue a compatible and consistent property revaluation program as required by statute.[2] In their complaint plaintiffs prayed for a refund of those taxes paid under protest, for an injunction restraining the defendant officials from levying or collecting further taxes pending compliance with all assessment requirements, and for such further relief as would be just and equitable.

The defendants, in response to plaintiffs' claim, in essence, admitted that their respective property assessment ratios, i.e., the relationship of assessed valuation to true and fair value, were less than 50 per cent and that there existed a disparity of approximately 5 per cent between the assessment ratios utilized by the respective counties and perforce between assessment ratios applied within the bicounty school district. The defendants contended, however, that the assessment ratios applied were substantially uniform within each county and that each county, within its staff and budgetary limitations, systematically and continuously, on a cyclical basis, revalued all taxable properties within its boundaries. In addition, Snohomish County and its designated officials, by way of a third-party complaint, sought to implead the Director of the State Department of Revenue upon the basis that any injunctive ruling concerning assessment ratios should be applied statewide through the director.

At this stage of the pleadings, the trial court denied a motion to dismiss the third-party complaint interposed by the Director of the Department of Revenue, following

---

[1]Const. art. 7, § 2 (amendment 17).

[2]RCW 84.41.

which the director sought a writ of prohibition in this court to forbid the trial court from proceeding further upon the third-party complaint. Hearing on the director's petition was deferred pending conclusion of a trial on the merits in the principal case, and then consolidated for argument with the appeal from the trial court's judgment in the principal case. An assistant attorney general assigned as counsel for the Department of Revenue attended upon the trial.

Trial of the principal case consumed several days, at the conclusion of which the trial court, in substance, found as facts that (1) the assessment ratios applied in each of the defendant counties were less than the constitutionally pre-scribed 50 per cent of true and fair value; (2) a disparity existed between the assessment ratios employed by the respective counties, which perforce resulted in a like dis-parity within the bicounty school district; (3) the underas-sessment of real property for tax purposes existent in both counties was consistent with a statewide pattern followed by all counties for many years; (4) a variance existed be-tween the respective counties in appraisal and revaluation practices and schedules, and that neither county, by reason of budgetary limitations, was able to strictly adhere to statutory cyclical revaluation requirements; (5) reassessed valuations were currently posted upon the assessment rolls of both counties, as opposed to being held back until com-pletion of a countywide revaluation program; and (6) al-though uniform millage rates were applied to the assessed values within the bicounty school district, the disparity between the assessment ratios and the revaluation practices and schedules utilized in the two counties created some disparity in the taxes levied and collected as between resi-dents of the respective counties as well as within the bi-county school district.

The trial court's findings in the foregoing respects, where not otherwise based upon admissions of the parties, are supported by the evidence.

From the findings of fact as a whole, and from the evi-dence admitted, the trial court, in substance, concluded

that, although the assessment and revaluation practices did not in all respects conform to constitutional and statutory requirements, such inequalities as resulted therefrom were not due to arbitrary, capricious or intentional discriminatory actions on the part of the respective county officials, were not actually or constructively fraudulent, did not violate the constitutional standards of uniformity and equality, and did not deprive plaintiffs as taxpayers of any significant rights to which they would otherwise be entitled.

Based upon the findings of fact and conclusions of law, the trial court entered judgment, the net effect of which was to (1) order that all taxable real property in King and Snohomish Counties be placed on the assessment rolls by the respective county assessors as of January 1, 1970, at a ratio of assessed value to true and fair value of 50 per cent; (2) direct the assessor of King County to correct certain designated appraisal practices theretofore utilized in the revaluation process; and (3) deny any refund to plaintiffs.

Plaintiffs appealed and both defendants, King and Snohomish Counties and the designated officials, cross-appealed. As above indicated, these appeals were consolidated for argument before this court with the pending petition of the Director of the Department of Revenue for a writ of prohibition.

Following oral argument of the consolidated causes, and after extensive conference consideration, this court, because of the wide public import of some of the issues presented, issued an order prefatory to this opinion indicating that a majority of its members had determined that (1) the director's petition for a writ of prohibition should be denied, and (2) the trial court's judgment should be affirmed insofar as it (a) required that assessment ratios within King and Snohomish Counties be brought up to the 50 per cent level as of January 1, 1970, and (b) denied plaintiffs' claim for a tax refund.

Before proceeding to a discussion of the issues raised by the assignments of error, we deem it appropriate to briefly outline some of the facts about which revolve the various contentions of the parties and which form the basis upon

which the trial court predicated its disposition of the matter.

Geographically speaking, King County covers an area of some 2,131 square miles, or 1,363,840 acres, and Snohomish County some 2,098 square miles, or 1,342,720 acres. Within the confines of King County there were approximately 400,000 parcels of property and within Snohomish County approximately 250,000 parcels of property for which the respective county assessors maintained assessed valuation records and which were at the pertinent times subject to and undergoing revaluation. The budget allocated to the King County Assessor permitted him to retain only 81 qualified appraisers while the Snohomish County Assessor was allowed only 26. Both assessors indicated that their staffs were wholly inadequate to permit annual inspection and revaluation of assessable parcels of property within their counties and very meager from the standpoint of carrying out a fixed cyclical revaluation schedule. Both assessors testified that timely and substantial budget requests which would permit them to expand or otherwise supplement their operations had not been readily forthcoming. Both counties were and are undergoing marked economic expansion and population growth, with resultant and sometimes abrupt changes in the uses and market values of properties in various parts, if not throughout, the respective counties.

Insofar as revaluation schedules were concerned, the evidence indicated, and the trial court so found, that King County sequentially revalued properties by ranges and townships on approximately a 6 to 7-year cycle, and that Snohomish County sequentially revalued its parcels by school districts on a 4-year cycle. Each county listed its reassessed valuations on a current basis, that is, by placing them on the assessment rolls as of January 1st of the year following completion of the reassessment, a practice followed generally by assessors statewide.

Northshore School District No. 417, the bicounty district involved, encompasses some 22,000 acres and approxi-

mately 9,000 parcels of assessable property in King County, and 13,500 acres and approximately 7,000 assessable units in Snohomish County. In 1966, by way of regular and specially authorized levies, a millage levy rate of 55.73 mills was imposed upon all taxable real property of the district lying within both King and Snohomish Counties, which was payable to the respective county treasurers in 1967. There was no planned coordination between the activities of the respective assessors in connection with their appraisal practices, revaluation schedules or assessment ratios applied within the overlapping school district.

In 1966, the average assessment ratio for all taxable property in King County was approximately 23.7 per cent of true and fair value and in Snohomish County the ratio ranged from 10 to 30 per cent (19.1 per cent indicated ratio), although it was testified by the respective assessors that they sought to apply a 25 per cent ratio in King County and a 20 per cent ratio in Snohomish County. Ratio studies made by the Department of Revenue for 1966, through a county-wide sampling of actual and then current sales of property, generally denoted a 19.8 per cent indicated ratio[3] in King County and 17.4 per cent indicated ratio in Snohomish County being applied to real property. The percentage of disparity between the two counties and within the bicounty school district was generally treated by the parties and the trial court as being roughly 5 per cent, with the level of the tax levied upon the assessed values accordingly varying within and between the counties and within and between the overlapping portions of the school district.

Against the foregoing procedural and factual backdrop, we turn to a consideration of those issues raised by the assignments of error of the respective parties which require discussion.

[3] "Indicated ratios" are the product of annual sales assessment studies conducted by the Department of Revenue, as distinguished from "fixed ratios" which are derived from the "indicated ratios" and determined by the State Board of Equalization.

Const. art. 7, § 2, as amended by amendment 17, in pertinent part provides:

> Except as hereinafter provided and notwithstanding any other provision of this Constitution, the aggregate of all tax levies upon real and personal property by the state and all taxing districts now existing or hereafter created, shall not in any year exceed forty mills on the dollar of assessed valuation, *which assessed valuation shall be fifty per centum of the true and fair value of such property in money:* . . .

(Italics ours.)

The legislature in implementing this constitutional provision has provided in RCW 84.40.030 and RCW 84.41.090, as follows:

> All property shall be assessed fifty percent of its true and fair value in money. In determining the true and fair value of real or personal property, the assessor shall not adopt a lower or different standard of value because the same is to serve as a basis of taxation; . . .

and

> Each assessor is hereby directed and required to value property in accordance with the standards established by RCW 84.40.030 and in accordance with the applicable rules, regulations and valuation manuals published by the tax commission.

All of the parties, through their respective counsel, concede indirectly, if not directly, that the trial court ruled correctly in holding that the above constitutional and statutory provisions were mandatory, and that such being so, county assessors were constitutionally and statutorily compelled to determine and place upon the assessment rolls all taxable property within their county at an assessed valuation of 50 per cent of its true and fair value. It was likewise conceded that such a conclusion was implicitly and properly reached by this court in *State ex rel. Barlow v. Kinnear,* 70 Wn.2d 482, 423 P.2d 937 (1967). Only amicus curiae counsel, John Spiller, disagreed, contending that the pertinent constitutional and statutory provisions, by admin-

istrative, legislative, and judicial tolerance over the years, had been treated and accepted as permissive, rather than mandatory.

■ We do not recede from our position in *State ex rel. Barlow v. Kinnear, supra.* Expressly, we hold that the constitutional language to the effect that assessed valuations "shall be fifty percentum of true and fair value" is mandatory, and that county assessors are bound thereby. Indeed, we find no tenable basis to hold otherwise.

■ Furthermore, we adhere to and reaffirm our holding in *Barlow* that, insofar as local valuation, revaluation, and equalization practices be concerned, the Department of Revenue is empowered and under a duty, pursuant to and consistent with prevailing legislative and constitutional guidelines and limitations, "to supervise and control the county assessors and the boards of equalization in the administration of the tax laws to the end that equalization and uniformity is secured throughout the state." Necessarily, this embraces the power on the part of the Department of Revenue to require, and enforce by lawful measures, conformity with the mandatory 50 per cent assessment ratio. To the limited extent that the "home rule" interpretation of *State ex rel. State Tax Comm'n v. Redd,* 166 Wash. 132, 6 P.2d 619 (1932), may be in conflict with *Barlow* and our present holding, such interpretation shall be deemed modified.

As we have noted, the evidence revealed and the trial court so found—indeed it is common knowledge—that the practice of disparate underassessing at the county level is and has been statewide and one indulged in for many years if not, in fact, a carry-over of sorts from territorial days. Although the practice of underassessment, and the inability to effectively bring about a uniform compliance with the constitutionally required assessment ratio, have in a large part contributed to the imbroglio of the state's tax structure, nevertheless, the trial court conceived, and we concur, that an abrupt and retroactive application and enforcement of the appropriate assessment ratio would serve no immediate and useful purpose. Accordingly, the trial court fash-

ioned that portion of its judgment requiring compliance with the 50 per cent assessment ratio prospectively.

As our preopinion order indicated, we affirm the trial court's action in this respect. We would modify our order and the trial court's judgment only to the extent that all counties involved be required to place all taxable property on the assessment rolls at the prescribed assessment ratio "as of January 1, 1970," rather than "not later than January 1, 1970." The purpose of this minor modification is to permit assessors to conform to prevailing statutory provisions relating to completion of assessment rolls, *i.e.,* RCW 84.40.020 and RCW 84.40.040.

We conclude this phase of the cause with the observation that compliance with the constitutionally prescribed assessment ratio hopefully will resolve many of the prevailing inequities and imbalances in the current property tax structure. The extent to which such compliance may effect the amount of future property taxes is a matter, in our view, subject to control by appropriate adjustment of millage rates.

### CONST. ART. 7, § 1 (AMENDMENT 14)

The designated amendment to the state constitution, approved by the voters in 1930, provides in pertinent part:

> All taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax . . .

Pointing to that portion of Const. art. 7, § 2 (amendment 17), which provides:

> The term "taxing district" for the purposes of this section shall mean any political subdivision, municipal corporation, district, or other governmental agency authorized by law to levy, or have levied for it, ad valorem taxes on property, other than a port or public utility district.

plaintiffs contend that the bicounty Northshore School District is a "taxing district" and "the authority levying the tax" within the contemplation of amendments 14 and 17; hence, the tax disparity within the district arising from the differing assessment ratios utilized by King and Snohomish

Counties amounts to a violation of the uniformity requirement of amendment 14.

Relying upon the import of *State ex rel. Tacoma School Dist. 10 v. Kelly*, 176 Wash. 689, 30 P.2d 638 (1934), and language contained in *Barlow* to the effect that counties, rather than school districts, are the authorities levying property taxes, within the contemplation of amendment 14, the trial court disagreed with appellants.

So do we.

■■ The word "levy" when used in connection with the authority to tax, while assuming other meanings through interchangeable or indiscriminate usage, strictly speaking denotes the exercise of a legislative function, whether state or local, which determines that a tax shall be imposed, and fixes the amount, purpose, and subject of the exaction. 3 T. Cooley, Taxation § 1012, at 2043-44 (4th ed. 1924).

Const. art. 7, § 9,[4] and art. 11, § 12,[5] permit the state legislature to vest county and other municipal authorities with the power to levy and collect taxes for local purposes, subject to such conditions and limitations as the constitution or the legislature may prescribe. These constitutional provisions are not self-executing, in the sense that county, city, and other municipal bodies are automatically invested with tax levying power. Rather, such political subdivisions must have an express grant of such power either by legislative act or other constitutional provision. *State ex rel. School Dist. 37 of Clark County v. Clark County*, 177 Wash.

---

[4]"The legislature may vest the corporate authorities of cities, towns and villages with power to make local improvements by special assessment, or by special taxation of property benefited. For all corporate purposes, all municipal corporations may be vested with authority to assess and collect taxes and such taxes shall be uniform in respect to persons and property within the jurisdiction of the body levying the same." Const. art. 7, § 9.

[5]"The legislature shall have no power to impose taxes upon counties, cities, towns or other municipal corporations, or upon the inhabitants or property thereof, for county, city, town or other municipal purposes, but may, by general laws, vest in the corporate authorities thereof, the power to assess and collect taxes for such purposes." Const. art. 11, § 12.

314, 31 P.2d 897 (1934); *Great N. Ry. v. Stevens County*, 108 Wash. 238, 183 P. 65 (1919).

Since the 1890's[6] the legislature, with some exceptions not here applicable, has invested county authorities, *i.e.*, the county commissioners, treasurer, auditor, and assessor, with the power and duty to list, appraise, and revalue or reassess all taxable property within the county and to post, apportion, equalize, levy, and collect virtually all local property taxes at prescribed millage rates for and on behalf of the county as well as the various local taxing districts—including school districts—not otherwise authorized by law to levy taxes. RCW 84.40, 84.41, 84.48, 84.52, and 84.56.

Within this statutory pattern, the legislature—again fairly early in the state's history—took from school districts the power to actually levy taxes, and provided, instead, that a school district would make up its budget and submit that budget to the appropriate county officials—the county commissioners—who would thereupon make the actual levy. So it is that RCW 28.65.120, in its latest form, provides:

> Upon the conclusion of the revision hearing in districts of the first class and upon the conclusion of the county reviewing committee's action in districts of the second and third class, the board or reviewing committee as the case may be shall certify the final budget and the amount to be raised by taxation *to the county commissioners for the levying of the district taxes in the manner now provided by law.*

(Italics ours.)

With respect to joint districts, defined as any school district composed of territory lying in more than one county (RCW 28.57.230), the legislature, after providing for apportionment of the tax to be levied within the joint district and the apportioned tax appropriately certified to the county commissioners (RCW 28.57.280, 28.57.290), determined in RCW 28.57.300 that

> Upon receipt of the aforesaid certificate, *it shall be the duty of the board of county commissioners of each*

---

[6] Laws of 1893, ch. 124, p. 323.

*county to levy on all taxable property* of that part of the joint school district which lies within the county a tax sufficient to raise the amount necessary to meet the county's proportionate share of the estimated expenditures of the joint district, as shown by the aforesaid certificate of the county superintendent. Such taxes shall be levied and collected in the same manner as other taxes are levied and collected, and the proceeds thereof shall be forwarded quarterly by the treasurer of each county, other than the county to which the joint district belongs, to the treasurer of the county to which such district belongs and shall be placed to the credit of said district. The treasurer of the county to which a joint school district belongs is hereby declared to be the treasurer of such district.

(Italics ours.)

Thus, it may be observed that however the function of the county officials may be characterized—*i.e.,* ministerial, administrative, or otherwise—those officials, as distinguished from the school district officials, perform the ultimate acts of levying, equalizing and imposing the tax at the rate fixed by law. The county, therefore, so far as regular levies and millages are concerned, constitutes the only authority levying the tax as that phrase is utilized in amendment 14.

We accordingly adhere to our holding in *Barlow* on this score. Regular levies, then, must be uniform throughout the county.

Plaintiffs argue, however, that such a holding necessarily means that excess levies must also be uniform throughout the county, thus preventing a disparity of special levies among school districts within the county. We cannot agree. Amendment 17, as well as its implementing legislation, permits the voters of any district to authorize, by appropriate vote, the imposition of a levy in excess of that otherwise permitted under the constitution and applicable statutory provisions. The electors thereby assume the role of quasi-legislators in determining whether, within their school district, an additional tax shall be imposed, the amount thereof, and the purpose and subject of the exaction. In this

sense, then, the electors along with the county commissioners become the authority levying the tax and render the uniformity provisions of amendment 14 applicable to the excess levies authorized within the particular school district.

CYCLICAL REVALUATION

RCW 84.41.030, based upon Laws of 1955, ch. 251, § 3, p. 1028, provides:

> Each county assessor shall commence, immediately if possible, but no later than January 1, 1956, a comprehensive program of revaluation of all taxable property within his respective county. Such program shall progress at a rate which will result in the revaluation of all taxable property within the county before June 1, 1958. Each assessor shall thereafter maintain an active and systematic program of revaluation on a continuous basis, and shall establish a revaluation schedule which will result in revaluation of all taxable property within the county at least once each four years. A copy of such schedule shall be filed by each assessor with the tax commission before October 15, 1956.

As previously noted, neither the King nor Snohomish County Assessors have fully complied with the import of RCW 84.41.030. The King County Assessor, by reason of volume of work, limited staffs and budgets, had proceeded on what amounts to a 6 to 8-year cycle of revaluation, depending to some degree on the type of property involved. The Snohomish County Assessor, though similarly beset with budgetary problems, has been able only recently to establish a 4-year cycle but not in the sequence contemplated by the statute. Both counties look forward to improvement with aid forthcoming from the state.

Both county assessors, in listing their respective revaluations upon the assessment rolls, list them as of January 1st of the year of revaluation. This they do in conformity with RCW 84.40.020, which provides in pertinent part:

> All real property in this state subject to taxation shall be listed and assessed every year, with reference to its value on the first day of January of the year in which it is assessed.

In addition to the lack of uniformity and inequities which appellants claim arise out of the varying and differing cycles of revaluation as between the counties as well as within the bicounty school districts, appellants argue strenuously that the county assessors further compound the disparities by entering revaluations annually and sequentially as they are completed, rather than "hold back" on the revaluations until their entire county is revalued following which they enter them as of a given "base year."

Essentially, plaintiffs contend that the practices of the respective assessors violate the equal protection clauses of the federal and state constitutions (U.S. Const. amend. 14; Const. art. 1, § 12) as well as the uniformity provisions of amendment 14 of the state constitution, thus rendering the revaluations and the taxes predicated thereupon void. In support of their position, plaintiffs point to *Moses Lake Homes, Inc. v. Grant County,* 365 U.S. 744, 6 L. Ed. 2d 66, 81 S. Ct. 870 (1961), and *Sparks v. McCluskey,* 84 Ariz. 283, 327 P.2d 295 (1958), as case authority supportive of their position.

Both of the cited cases involved isolated and intentional discrimination in valuations of property for tax purposes. In *Moses Lake Homes,* Wherry Act leaseholds were deliberately assessed at full value whereas other leaseholds were not so assessed. The court held this was patent discrimination against the federal government and its lessees, and struck the resultant tax down as void. In *Sparks,* the assessor involved systematically and intentionally utilized a method of reaching a different and substantially disproportionate valuation of the plaintiff's property than the method he used in reaching lesser values for other like properties. The court accordingly held such intentional and gross discrimination to be invalid.

In the instant case, as we have pointed out, the trial court concluded, under the circumstances revealed by the evidence, that the respective assessors' actions did not amount to intentional discrimination, or constructive fraud, were not arbitrary and capricious, did not result in grossly

unequal valuations, and did not deprive plaintiffs of any substantial rights to which they were otherwise entitled. The trial court then determined that the actions complained of did not violate constitutional standards of equality and uniformity.

We are inclined to agree with the trial court.

The evidence indicates quite clearly that, to the best of their ability, and with their limited staffs, the assessors involved were honestly endeavoring to pursue a systematic nondiscriminatory cyclical approach to revaluation. In this vein it is to be borne in mind that the statute (RCW 84.41.040) requires a physical inspection of each of the parcels revalued and that King County had some 400,000 and Snohomish County some 250,000 parcels subject to revaluation. The sheer physical problem of annually inspecting the units of property involved, coupled with the staff and budgetary allocations required to accomplish such, lends wisdom to the legislative act authorizing and directing a cyclical approach, and virtually lays to rest any viable claim to intentional discrimination inhering in the system.

Furthermore, it appears from the evidence that in annually posting their revaluations the assessors were not only following the direction of RCW 84.40.020 but were also pursuing a statewide practice. And, from the evidence adduced, it is not at all clear that by adopting the "hold back" and "base year" approach advocated by plaintiffs such a system would in fact produce, under the circumstances prevailing, any greater equality than that arising out of the cyclical system. Lastly, the evidence does not disclose any gross or flagrant overvaluations insofar as any of plaintiffs' properties be concerned. Rather, plaintiffs predicate their attack upon assessment ratios, which in no case equal the 50 per cent ratio required by the constitution, and for the most part show only a disparity between counties and within the school district of approximately 5 per cent.

In *Sunday Lake Iron Co. v. Township of Wakefield,* 247 U.S. 350, 62 L. Ed. 1154, 38 S. Ct. 495 (1918), in denying relief to a taxpayer claiming an increase in property valua-

tion violated the equal protection clause of the federal constitution, the court stated, at 352:

> The purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents. And it must be regarded as settled that intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property. [Citing case.] It is also clear that mere errors of judgment by officials will not support a claim of discrimination. There must be something more—something which in effect amounts to an intentional violation of the essential principle of practical uniformity. The good faith of such officers and the validity of their actions are presumed; when assailed, the burden of proof is upon the complaining party. [Citing cases.]
>
> The record discloses facts which render it more than probable that plaintiff in error's mines were assessed for the year 1911 (but not before or afterwards) relatively higher than other lands within the county although the statute enjoined the same rule for all. But we are unable to conclude that the evidence suffices clearly to establish that the State Board entertained or is chargeable with any purpose or design to discriminate. Its action is not incompatible with an honest effort in new and difficult circumstances to adopt valuations not relatively unjust or unequal.

In keeping with the import of the *Sunday Lake* decision, state courts which have considered cyclical revaluation programs have generally found them to be compatible with constitutional equal protection and uniformity provisions, provided they be carried out systematically and without intentional discrimination. *Hamilton v. Adkins,* 250 Ala. 557, 35 So. 2d 183, *cert. denied,* 335 U.S. 861, 93 L. Ed. 407, 69 S. Ct. 133 (1948); *Skinner v. New Mexico State Tax Comm'n,* 66 N.M. 221, 345 P.2d 750, 76 A.L.R.2d 1071 (1959). And, for similar but not identical import, see cases cited and discussed in *Tax—Incomplete Equalization Program,* Annot., 76 A.L.R.2d 1077 (1959).

This court, too, has considered, in part at least, the problems arising out of a cyclical program in *Mason County Overtaxed, Inc. v. County of Mason,* 62 Wn.2d 677, 384 P.2d 352 (1963). In that case, it appeared that the Mason County Assessor was pursuing cyclical revaluation as set forth in RCW 84.41.030, which in turn produced substantial increases in the plaintiffs' property valuations as those properties were reached in the cyclical process. In denying the plaintiffs relief, we pointed out that the assessment ratio is predicated upon the market value of the property involved at the time of its valuation and that increases in real-estate assessments, without more, is as consistent with a preceding undervaluation, as it is with the idea of a current excessive valuation, and, upon these premises, held that the plaintiffs had failed to establish that their property had in fact been overvalued.

The same is true in the instant case.

Accordingly, we conclude that, although each of the assessors involved were precluded by fiscal, personnel, volume, and time considerations from precisely adhering to the statutorily designated cyclical schedule or from conducting annual total revaluation programs, it has not been shown that their honest attempts at compliance resulted in intentional discrimination, arbitrary action, constructive fraud, or grossly and relatively unfair assessments contrary to constitutional provisions relating to equal protection and uniformity. Furthermore, the record indicates that determined efforts on the part of the respective assessors, the legislature, and the Department of Revenue, are underway which can lead to substantial improvements in valuation schedules and the maintenance of greater uniformity and equality in the future.

APPRAISAL METHODS

Both the King County and Snohomish County Assessors, at the times involved, were utilizing the real-estate appraisal manual prepared by the Department of Revenue and following the appraisal methods therein advocated.

The evidence adduced at trial, however, indicated that in

pursuing his revaluation schedule, the King County Assessor was (1) attempting to apply a "long run value" to the properties revalued, and (2) deducting costs of sale, *i.e.*, broker's commissions, excise and transfer taxes, title insurance expense, and escrow fees, in reaching his determination of market value. The Snohomish County Assessor, on the other hand, followed neither practice. The trial court directed that the King County Assessor hereafter refrain from such practices.

Plaintiffs contend that these practices have resulted in compounding the alleged inequalities between the counties, and King County assigns error to the trial court's ruling contending that the questioned practices are permissible.

■ Again, as to plaintiffs' contentions, we find no gross or flagrant inequalities, intentional discrimination or constructive fraud springing from the actions of the King County Assessor. Although the practices may not be in strict conformity with the law, they do not render the resultant assessment void. *Ballard v. Wooster*, 182 Wash. 408, 45 P.2d 511 (1935).

Amendment 17 of the state constitution provides that the assessed value of properties for purposes of taxation shall be 50 per cent of "the true and fair value of such property in money." Implementing this provision RCW 84.40.030 provides, in pertinent part:

> All property shall be assessed fifty percent of its true and fair value in money. In determining the true and fair value of real or personal property, the assessor shall not adopt a lower or different standard of value because the same is to serve as a basis of taxation; . . . but he shall value each article or description of property by itself, and at such price as he believes the same to be fairly worth in money at the time such assessment is made. The true cash value of property shall be that value at which the property would be taken in payment of a just debt from a solvent debtor.

In construing and applying our constitutional and statutory reference to true and fair value, we stated in *Mason*

*County Overtaxed, Inc. v. County of Mason,* 62 Wn.2d 677, 384 P.2d 352 (1963), at 683:

> The purpose of the foregoing statute [RCW 84.30.030] is clear; it enjoins the assessor to determine the true and fair value of the property in money. Expressed otherwise, he shall make his assessment upon the market value. Market value means the amount of money which a purchaser willing, but not obliged, to buy would pay an owner willing, but not obligated, to sell, taking into consideration all uses to which the property is adapted and might in reason be applied. *Ozette R. Co. v. Grays Harbor Cy.,* 16 Wn. (2d) 459, 133 P. (2d) 893.

Neither practice adopted by King County, in our view, comports fully with the statutory requirements nor with our interpretation of the meaning of the phrase "true and fair value of the property in money." The "long run value" approach runs contrary to the statutory provision that the assessor shall not adopt a lower or different standard of value for tax purposes, as well as the provision that the property shall be appraised at its market value as of the time the assessment is made. As to the cost deductions, the record is devoid of any evidence indicating that such is compatible and generally in keeping with ordinary concepts employed in reaching a market value appraisal for any purpose, or constitutes a practice indulged in by counties other than King County.

We conclude that the trial court did not err, as the record stands, in directing the King County Assessor to abandon each practice.

### REFUND

As we have heretofore indicated, we are satisfied that plaintiffs have failed to establish intentional discrimination, arbitrary or capricious action, constructive fraud or grossly unequal taxation to the extent necessary to constitute a violation of the constitutional standards of equality and uniformity, thereby rendering the complained of exactions void.

We, therefore, affirm the trial court's denial of a refund, and reaffirm our preopinion order in this respect.

CONCLUSION

The Department of Revenue, since oral argument, has withdrawn its application for a writ of prohibition. All other assignments of error are either waived or do not merit further discussion.

The trial court's judgment, with the minor modification heretofore mentioned, is affirmed. The Department of Revenue, as a present party to this action, is to effect statewide compliance with pertinent portions of this opinion.

HUNTER, C. J., HILL, FINLEY, ROSELLINI, HALE, NEILL, and McGOVERN, JJ., and DONWORTH, J. Pro Tem., concur.

December 8, 1969. Petition for rehearing denied.

