Honorable Randy Dorn Superintendent of Public Instruction PO Box 47200 Olympia, WA 98504-7200
Dear Superintendent Dorn:
By letter previously acknowledged, you have requested our opinion on two questions, which we paraphrase for clarity:
 1. RCW 84.33.081(2) through (4) describes priorities for quarterly distribution of timber excise tax revenues. How should those priorities be implemented when revenues fall short of the amount that was projected to be generated, along with property tax revenues, when levying property taxes? For example, if money is paid to a lower-priority taxing district in the first two quarters of the year, but revenues fall short of fully paying the higher-priority taxing districts during the third or fourth quarters, may distributions to a lower-priority district be taken back and redistributed to the higher-priority districts?
 2. May school district property tax rates be adjusted to generate the full local levy revenue approved by the voters when the timber excise tax distributions to the school district fall short of the revenues that were projected when setting the property tax rate for the school district levy? *Page 2 
 BRIEF ANSWER
As a result of the quarterly distributions required by RCW 84.33.081, lower-priority taxing districts may receive timber excise tax revenues in the first or second quarter of the year. If timber excise tax revenues decline during the third and fourth quarters, it could result in the top-priority taxing districts receiving less than their full distribution when lower-priority districts receive some payments. In such a situation, the county has no authority to take distributions back from a lower-priority district in order to redistribute it to the higher-priority districts. Further, the county would have no authority to adjust previously established property tax rates during a year in which the timber excise tax revenues fall short of the projections used when setting those property tax rates.
 BACKGROUND
Your questions concern the timber excise tax. Before turning to your specific questions, it is helpful to first explain that tax, and the way that revenues from it are distributed under state law.
Washington imposes the timber excise tax on persons engaging in the business of harvesting timber. The tax is based on the stumpage value of the timber harvested for sale or commercial or industrial use, multiplied by the rate of tax. See
RCW 84.33.041(1) (imposing tax); RCW 84.33.046 (setting rate at five percent); see also RCW 84.33.051 (authorizing counties to impose timber excise tax).[1]
The revenues received from the state and county timber excise taxes are deposited in the state timber tax distribution account. RCW 84.33.041(3), .051(2). On the last business day of the second month of each calendar quarter, the state treasurer transfers to each county "the amount of tax collected on behalf of each county under RCW 84.33.051," less each county's proportionate share of collection and administration costs. RCW 84.33.081(1). The county treasurer must then deposit that money into a county timber tax account. RCW 84.33.081(1).
The statutory scheme illustrates how timber excise tax revenues are applied as a substitute for property tax revenues. Before October of each year, the Department of Revenue determines each county's "timber assessed value" based on certain public and private forestlands in the county and various taxing districts. RCW 84.33.035(18), (19). County assessors are then required to add all or a portion of a taxing district's timber assessed value to the assessed value of other taxable property in that taxing district, when they compute the rate of any excess levy in a taxing district that includes classified or designated forest land. RCW 84.52.080. The property *Page 3 
tax rates that are set for each local taxing district levy thus reflect a premise (or as you put it in your first question, a projection) that the affected taxing district will receive a distribution of timber excise tax revenues that, in addition to property taxes, will be sufficient to generate the dollar amount of the levy. RCW 84.33.035(18), (19).[2]
RCW 84.33.081 describes several priorities for distributions from the timber tax distribution accounts of each county. As noted above, the state treasurer distributes timber tax revenues on a quarterly basis, in the second month of each calendar quarter. RCW 84.33.081(1). In turn, the statute mandates that the county treasurer distribute the timber tax revenues among taxing districts in the county in accordance with the priorities in subsections (2) through (4).
 Following receipt of moneys under this section, the county treasurer shall make distributions from any moneys available in the county timber tax account to taxing districts in the county, except the state, under subsections (2) through (4) of this section.
RCW 84.33.081(1) (emphasis added).
There are three priorities for distribution relevant to your questions.[3] The first priority is in subsection (2). Subsection (2) requires that the first distribution be made to the taxing districts that have certain debt service and capital project payments due during the year.
 [T]here first shall be a distribution to each taxing district having debt service payments due during the calendar year, based upon bonds issued under authority of a vote of the people conducted pursuant to RCW 84.52.056 and based upon excess levies for a capital project fund authorized pursuant to RCW 84.52.053, of an amount equal to the timber assessed value of the district multiplied by the tax rate levied for payment of the debt service and capital projects[.] . . . Distribution under this subsection (2) shall be used only for debt service and capital projects payments. The distribution under this subsection shall be made as follows: One-half of such amount shall be distributed in the first quarter of the year and one-half shall be distributed in the third quarter of the year.
RCW 84.33.081(2) (emphasis added). *Page 4 
After the distribution of funds under subsection (2), the county treasurer next distributes funds under subsection (3). This second priority includes levies by school districts under RCW 84.52.052 or .053 for purposes other than debt service payments and capital projects.
 From the moneys remaining after the distributions under subsection (2) of this section, the county treasurer shall distribute to each school district an amount equal to one-half of the timber assessed value of the district or eighty percent of the timber roll of such district in calendar year 1983 as determined under this chapter, whichever is greater, multiplied by the tax rate, if any, levied by the district under RCW 84.52.052 or 84.52.053 for purposes other than debt service payments and capital projects supported under subsection (2) of this section. The distribution under this subsection shall be made as follows: One-half of such amount shall be distributed in the first quarter of the year and one-half shall be distributed in the third quarter of the year.
RCW 84.33.081(3) (emphasis added).
The third priority is in subsection (4).
 After the distributions directed under subsections (2) and (3) of this section, if any, each taxing district shall receive an amount equal to the timber assessed value of the district multiplied by the tax rate, if any, levied as a regular levy of the district or as a special levy not included in subsection (2) or (3) of this section.
RCW 84.33.081(4) (emphasis added).
 ANALYSIS
1. RCW 84.33.081(2) through (4) describes priorities forquarterly distribution of timber excise tax revenues. How shouldthose priorities be implemented when revenues fall short of theamount that was projected to be generated, along with property taxrevenues, when levying property taxes? For example, if money is paidto a lower-priority taxing district in the first two quarters of theyear, but revenues fall short of fully paying the higher-prioritytaxing districts during the third or fourth quarters,may distributions to a lower-priority district be taken back andredistributed to the higher-priority districts?
Your first question concerns application of the statutory priorities when a county's actual timber excise tax revenues fall short of the amount that was projected to be received when setting the property tax rates. We conclude that the statute requires the county to distribute revenues each quarter, and that there is no authority for taking money back after it is distributed to be redistributed. This is a natural and intended result of the statutory language, which divides the *Page 5 
payment of the higher-priority districts into first-half and second-half payments, and contemplates distribution to lower-priority districts prior to paying the second-half payments.
We will start by illustrating how a shortfall in projected timber excise tax revenue may result in lower-priority taxing district receiving revenue distributions when the higher-priority districts do not receive the full amount of the annual distribution established under RCW 84.33.081. Subsection (2) of RCW 84.33.081, quoted above, establishes the amount of timber excise tax revenue to be distributed to first-priority districts — i.e., districts having voted debt service payments due during the calendar year on bonds or capital projects. The distribution amount is "an amount equal to the timber assessed value of the district multiplied by the tax rate levied for payment of the debt service and capital projects." RCW 84.33.081(2). Notably, subsection (2) further provides that "[o]ne-half of such amount shall be distributed in the first quarter of the year and one-half shall be distributed in the third quarter of the year." This allows revenues in excess of the "first-half" payment to be distributed to the second-or third-priority districts. Thus, if the county receives timber excise tax revenue in excess of one-half of the annual amount to be distributed to first-priority districts under subsection (2), that excess revenue is distributed next to the second-priority districts — i.e., school districts with regular or special levies for purposes other than debt service on bonds or capital projects. The distribution amount for such districts is established by subsection (3). See RCW 84.33.081(3) (quoted above). As with the first-priority distribution, the second-priority distribution is one-half of the total annual timber excise tax distribution. Subsection (3) provides that "[o]ne-half of such amount shall be distributed in the first quarter of the year and one-half shall be distributed in the third quarter of the year." RCW 84.33.081(3). Then, subsection (4) provides that the third priority will receive "moneys remaining after the distributions" required for the first and second priorities.[4]
Distribution of the first-quarter revenues is, therefore, relatively straightforward. The authority to distribute timber excise tax revenues to the second-priority districts is contingent on whether the county receives revenue that exceeds the required first-half payment to the first-priority districts. In turn, unless the revenues in the first quarter actually exceed the required first-half payments for both the first-and second-priority districts, the third-priority districts receive nothing under the first-quarter distribution formula. We conclude that the distribution requirement in subsections (2) through (4) is unambiguous in this regard.
The statute lacks explicit direction for the second (or fourth) quarters. We conclude, however, that the county treasurer is required to distribute revenues upon receipt in the second quarter and to apply such revenues following the requirements for the first quarter.
To explain this conclusion, we start with the fact that the statute contemplates that counties receive revenues each quarter. Subsection (1) explicitly states that the state treasurer "shall distribute" the county's portion of timber excise tax revenues on the last business day of the second month of "eachcalendar quarter." Next, we note that subsection (1) requires *Page 6 
distribution by the county of "any moneys available" and to do so "[f]ollowing receipt" from the state treasurer. This statutory language, read naturally, mandates distribution each quarter upon receipt.[5]
We recognize that the language in subsections (2) and (3) does not explicitly address second-quarter revenues. However, the interpretation most consistent with the statute requires that second-quarter revenues be used to complete the requirements of the first quarter. Thus, revenue in the second quarter should be used to finish paying the required "first-half" payments for the first-and second-priority districts. Then, if timber excise tax revenue exceeds the required first-quarter distributions, the second-quarter revenues would be distributed to the third-priority taxing districts as provided in subsection (4). In this way, the statute mandates distribution in a manner that allows the third-priority taxing districts to receive money during the first or second quarter, which is before the first-and second-priority levies receive the "second-half" payments.
This possibility of payment to third-priority districts before fully paying the higher priority districts is the direct and natural result of the mandated distribution formulas. We therefore conclude that it is both required and lawful under the statute. State v.Costich, 152 Wn.2d 463, 470, 98 P.3d 795 (2004) ("we presume the legislature says what it means and means what it says").
Furthermore, the legislative history for the statutory amendments that created quarterly distribution requirements confirm that the legislature intended to distribute money to the third-priority districts, if available, after paying the required half-payments for the higher-priority districts.State v. Alvarez, 128 Wn.2d 1, 11, 904 P.2d 754 (1995) (The fundamental objective in construing a statute is to ascertain and carry out the intent of the legislature.). A prior version of RCW 84.33.081 required that the first-and second-priority distributions be fully satisfied before taxing districts set to receive third-priority distributions would receive anything. In 1985, the legislature amended the statute to adopt the above-described quarterly distributions. Laws of 1985, ch. 184, § 1. The House Bill Report for that legislation explained that the new distribution scheme was adopted to address "cash flow" problems for the lower-priority taxing districts. The legislature understood that it was retaining the original priorities, but with a significant modification: "50 percent of the funds are to be distributed in the first quarter and 50 percent in the third quarter. This . . . addresses the cash flow concerns of the other taxing districts." H.B. Rep. on Engrossed H.B. 914, 49th Leg., Reg. Sess. (Wash. 1985).
Your question asks whether a county facing this scenario could recover a distribution to a lower-priority district in order to redistribute that timber excise tax revenue to a higher-priority district. While such an inquiry is undoubtedly motivated by meeting the important first and second priorities, we find no statutory authority for taking distributions back. Instead, the *Page 7 
statutory scheme contemplates that distributions may be made to third-priority districts before the first-and second-priority districts have received the full annual distribution. Accordingly, the statute provides for the possibility that third-and fourth-quarter timber excise tax revenues may be insufficient to fully pay the "second half" of the first or second priorities, even though the third-priority districts received some moneys during the first half of the year.
2. May school district property tax rates be adjusted togenerate the full local levy revenue approved by the voters when thetimber excise tax distributions to the school district fall short ofthe revenues that were projected when setting the property tax ratefor the school district levy?
Your second question asks whether a county could adjust the school district property tax rates to generate the full local levy amount approved by the voters when timber excise tax distributions to the school district fall short of the revenues projected when setting the property tax rate for the school district levy. To state the matter another way, you ask whether property tax rates for school district levies could be raised during the tax year, in order to make up for shortfalls in the timber excise tax revenue. We find no authority for adjusting the property tax rate during the tax year.
RCW 84.52.030 provides that a tax amount is levied for a future year:
 For the purpose of raising revenue for state, county and other taxing district purposes, the county legislative authority of each county at its October session, and all other officials or boards authorized by law to levy taxes for taxing district purposes, shall levy taxes on all the taxable property in the county or district, as the case may be, sufficient for such purposes, and within the limitations permitted by law.
The county assessor is then charged with taking the levy amount and converting it into a percentage rate upon the assessed valuation of property for all taxes. RCW 84.52.010. The process for determining dollar rate of property taxes applicable to school district excess levies is described by RCW 84.52.054:
 The additional tax provided for in Article VII, section 2 of the state Constitution, and specifically authorized by RCW 84.52.052, 84.52.053, 84.52.0531, and 84.52.130, shall be set forth in terms of dollars on the ballot of the proposition to be submitted to the voters, together with an estimate of the dollar rate of tax levy that will be required to produce the dollar amount; and the county assessor, in spreading this tax upon the rolls, shall determine the eventual dollar rate required to produce the amount of dollars so voted upon, regardless of the estimate of dollar rate of tax levy carried in said proposition.
This statutory scheme — where the taxes are levied for a year and the percentage rate is determined for the year — cannot be reconciled with changing the property tax rate during the *Page 8 
year. For example, this would result in sending additional property tax bills to those who have already been billed and who may even have already paid all or a portion of their property taxes.
Thus, even if timber excise tax revenues decline below projections used to set the percentage rate, we see no basis for adjusting the property tax rates during the tax year in an effort to collect the approved levy amount from property taxpayers.
We trust that the foregoing will be useful to you.
ROB MCKENNA Attorney General
JAY DOUGLAS GECK Deputy Solicitor General
wros
[1] Timber excise taxes are a substitute for a former advalorem property tax on timber and forest lands. The legislature eliminated the ad valorem tax because of the difficulty of valuing and assessing timber and forest lands. RCW 84.33.010 (legislative findings). The statutes governing the timber excise tax are, in fact, codified in RCW Title 84, which is otherwise devoted to property taxes.
[2] "The word `levy' when used in connection with the authority to tax, while assuming other meanings through interchangeable or indiscriminate usage, strictly speaking denotes the exercise of a legislative function, whether state or local, which determines that a tax shall be imposed, and fixes the amount, purpose, and subject of the exaction." Carkonen v. Williams,76 Wn.2d 617, 627, 458 P.2d 280 (1969) (citing 3 T. Cooley, Taxation § 1012, at 2043-44 (4th ed. 1924)).
[3] It is possible to characterize subsection (6) of the statute as setting up "fourth and fifth" priorities for distribution of timber excise tax revenues. Subsection (6) provides for paying a percentage of excess revenues to a reserve fund and distribution of any remainder to the taxing districts. It is unnecessary to discuss these potential distributions to answer your questions.
[4] Subsection (5) provides a formula for pro rata distribution among the third-priority taxing districts when the revenues are sufficient only to pay part of the entire third-priority distributions.
[5] This approach also avoids the impracticality of having no distribution of fourth-quarter revenues. If fourth-quarter revenues are not distributed, then the lowest-priority districts might not receive any revenues, even when such revenues are available during the fourth quarter.